·Charley Jackson v. The State.

No. 813. Decided June 14, 1911.

Rehearing denied October 18, 1911.

1.—Murder—Race Discrimination—U. S. Supreme Court.

Where, upon appeal from a conviction of murder, the cause was reversed on other grounds, and the question of race discrimination was not fully developed in the court below, the same will not be considered; but the State courts are bound by the decisions of the United States Supreme Court.

2.—Same—Change of Venue—Bill of Exceptions.

Where the question of change of venue is not presented by proper bill of exceptions, it can not be considered on appeal.

3.—Same—Charge of Court—Defensive Matter.

It is not essential, in the court's charge of murder in the first degree, that the court should give in a negative way the defenses of the accused.

4.—Same—Charge of Court—Murder in the Second Degree—Manslaughter.

Where the evidence raised the issue of manslaughter, the court in his charge on murder in the second degree should have charged the jury as to what constitutes this degree of murder, with reference to any lesser degree of homicide.

5.—Same—Charge of Court—Manslaughter.

Where, upon trial of murder, the evidence raised the issue of manslaughter, the court should have charged thereon.

6.—Same—Self-Defense—Threats.

Where the court's charge on self-defense was too general, it was reversible error not to submit requested charges which properly applied the law to the issue of self-defense and threats.

7.—Same—Evidence—Manslaughter.

Upon trial of murder, it was reversible error to refuse to admit testimony to show that the defendant, at the time of the homicide, was very much excited and feared an attack by the deceased.

8.—Same—Evidence—Third Parties.

Upon trial of murder, there was no error in refusing to admit testimony of ill-feeling existing between the deceased and a third party for failing to pay rent to the latter.

9.—Same—Evidence—Dying Declarations.

Upon trial of murder, it was reversible error to admit in evidence the declaration of the wife of the deceased that she kissed her husband shortly before he died, and that he requested her to kiss him "good-bye," etc., as this was no part of the dying declaration

10.—Same—Evidence—Clothes of Deceased.

Where the introduction in evidence of the clothes of deceased, which he wore

when he was shot, was to show the position of his gun at the time, and that defendant fired the first shot, there was no error.

**11.—Same—Evidence—Declaration of Third Parties.**

There was no error to exclude the testimony of defendant's father of what defendant told him when he first saw him, some time after the killing.

**12.—Same—Argument of Counsel—Death Penalty.**

It is legitimate for State's counsel to insist upon the infliction of the death penalty, where the evidence justifies it, but he must confine himself to the record.

**13.—Same—Charge of Court—Threats.**

Where the evidence raised the issue of threats by deceased against the defendant, the court correctly charged thereon.

Appeal from the District Court of Navarro. Tried below before the Hon. H. B. Daviss.

Appeal from conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Callicutt & Call*, for appellant.—Upon the question of race discrimination: Carter v. State of Texas, 177 U. S. Sup. Court, 442; Leach v. State, 62 S. W. Rep., 422; Collins v. State, 60 S. W. Rep., 42; Smith v. State, 44 Texas Crim. Rep., 90; Whitney v. State, 42 Crim. Rep., 283; Lewis v. State, 59 S. W. Rep., 1116.

Upon question of court's charge on murder in the second degree: Clark v. State, 51 Texas Crim. Rep., 519; Smith v. State, 123 S. W. Rep., 698; Best v. State, 125 S. W. Rep., 909; Green v. State, 126 S. W. Rep., 860; Davis v. State, 124 S. W. Rep., 104; Barr v. State, 120 S. W. Rep., 422; Wheeler v. State, 121 S. W. Rep., 166; Harrison v. State, 83 S. W. Rep., 699; Connell v. State, 81 S. W. Rep., 746; Thomas v. State, 74 S. W. Rep., 36; Kannmacher v. State, 51 Texas Crim. Rep., 118; Boyd v. State, 28 Texas Crim. Rep., 524; Whitaker v. State, 12 Texas Crim. Rep., 436.

Upon question of court's charge on self-defense: Yardley v. State, 100 S. W. Rep., 399; Jones v. State, 17 Texas Crim. Rep., 602; Hatton v. State, 31 Texas Crim. Rep., 586; Cockran v. State, 28 Texas Crim. App., 422.

Upon question of court's charge on threats: Fielding v. State, 87 S. W. Rep., 1045; Watson v. State, 95 S. W. Rep., 115; Cline v. State, 71 S. W. Rep., 23; Hickey v. State, 45 Texas Crim. Rep., 297; Richards v. State, 110 S. W. Rep., 432.

On question of court's failure to charge on manslaughter: Tillman v. State, 51 Texas Crim. Rep., 202; Green v. State, 126 S. W. Rep., 860; Hardcastle v. State, 36 Texas Crim. Rep., 555; Baltrip v. State, 30 Texas Crim. App., 545; Hawthorne v. State, 28 Texas Crim. Rep., 212; Howard v. State, 23 Texas Crim. Rep., 265; Johnson v. State, 22 Texas Crim. App., 206; Hobbs v. State, 16 Texas Crim. Rep., 517;

Williams v. State, 15 Texas Crim. App., 617; Rutherford v. State, id., 236; Neyland v. State, 13 Texas Crim. App., 536.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—The appellant was indicted and convicted of murder in the first degree, and given a life sentence in the penitentiary.

The record contains about 300 pages of typewritten matter. Many questions are raised, and some of them presented by a brief for the appellant. It will be unnecessary for us to notice all of these various questions. Some of them, doubtless, will not occur upon another trial. We will, therefore, discuss and decide only such as we regard as material.

1. The first question raised is on motion to quash the indictment, claiming that as the appellant was a negro, he was discriminated against in the selection of the grand jury which indicted him. He also raised the same questions as to the special venire out of which the jury was selected.

This question seems not to have been fully developed. The State contested the matter, and it seems that there was only one of the jury commissioners who testified and one other witness. From the bills raising these questions and the contest of the matter by the State, it seems that it was raised after the State had announced ready for trial on a call of the case for that purpose. We will not undertake to pass upon that question now. If it is raised again, it will doubtless be fully developed so that the court below and this court, can more intelligently pass upon the question.

There are many decisions on the question by the United States Supreme Court and by this court. This court is bound by the construction of the United States Supreme Court, and would follow, of course, those decisions. We deem it unnecessary to cite them, but direct the earnest attention of the lower court to the questions if they are raised again. If there is any sufficient doubt on the subject, the State can reindict, if necessary or proper, and so select the jury commissioners, the grand jury, and the special venire to try this, as well as all other like cases, so as to avoid an error.

2. Another question raised is the overruling of appellant's motion for a change of venue. This is not presented by a proper bill of exceptions, and, therefore, can not be considered.

3. The appellant complains of the charge of the court in submitting the question of murder in the first degree, and also murder in the second degree, as to the first, claiming that in the submission of both degrees of murder, it was the duty of the trial court to present in a negative way, the claim of self-defense by the appellant; and as to the

charge of murder in the second degree, he makes the same complaints, and further, that the proper definition of murder in the second degree was not given, in that no definition of manslaughter nor of adequate cause was given so as to properly define murder in the second degree, and leaving the jury in the dark as to what constitutes murder in the second degree.

The charge of the court must be taken as a whole. All of the law of the case can not be given in any one paragraph or sentence, of course. The court's charge submits correctly the question of murder in the first degree to the jury. It is not essential in that charge that the court should give, in a negative or other way, the appellant's defenses, and it is not reversible error to thus charge. However, it might be better in some instances to do so.

As to the charge on murder in the second degree, we think the appellant's contentions are correct, in that the jury was somewhat left in the dark as to what constitutes murder in the second degree, with reference to any lesser degree of homicide. This, perhaps, might not be the case if manslaughter had not been raised by the evidence, and as we think, should have been submitted to the jury.

4. Complaint was also made that the evidence in this case clearly raised manslaughter, and that the court erred in not submitting that issue to the jury. In our opinion, the evidence in this case clearly raises the issue of manslaughter, and the court erred in not submitting it to the jury. All of these questions were properly raised by the appellant, both by bills of exception and in his motion for a new trial.

5. Another complaint by the appellant is made of the charge of the court on self-defense, claiming that it was too general and did not apply the facts of the case to the law of self-defense. The evidence in the case clearly raised the issue of self-defense, in addition to the question of threats by the deceased against the appellant. The appellant asked special charges on the question of self-defense, which were refused, applying the law of the case on this subject to the testimony introduced on the trial. We deem it unnecessary to either quote the charge of the court on the subject or the requested charges refused, but are of the opinion that the substance of the special charges refused should have been given to the jury.

It is unnecessary to detail the evidence in this case. We will only state, in a general way, the substance of the testimony.

Isaiah Jackson, the father of appellant, rented a certain place in Navarro County, from C. L. Witherspoon, for the year 1909, and again for the year 1910. On the place rented were at least two sets of houses, a few hundred yards apart. One of these houses was occupied by Isaiah Jackson and the appellant during the year 1909. The deceased, Walter Murphy, a white man, rented the other house from Isaiah Jackson for the year 1909. During that year the appellant married, and his father wanted possession of this house from Murphy

for the year 1910, so as to put the appellant and his wife therein, he needing the room in the house he occupied for the purpose of placing a hired hand therein. In seeking to get possession of the house from Murphy, some trouble was experienced. So that Isaiah Jackson went to his landlord, Witherspoon, stating the facts to him and the necessity of his having the house by the first of January, 1910, explaining the necessity therefor, and that some trouble was being had to induce Murphy to give possession thereof. Witherspoon thereupon wrote to Murphy demanding the possession of the house for Jackson, and in effect, stated therein that Jackson had informed him that he (Murphy) declined to deliver possession. This letter or notice was given with a view of instituting proceedings to eject Murphy and recover possession of the property. When Murphy received this notice or letter he became incensed at Jackson, claiming that he had falsely told Witherspoon that he was, in effect, refusing to give possession of the house, and just a few days before the killing, Murphy caused Isaiah Jackson to come to his house, where he cursed and abused him thereabout, and Jackson testified that Murphy, in effect, stated that he would not give possession of the property unless or until it suited him. Still later and just a few days before the killing, one of Murphy's dogs was wounded by a shot. Murphy claimed that the appellant had shot his dog, and just two days before the killing, he went to Jackson's house with his brother-in-law, a young lad about 17 years of age, and his wife, Murphy and his brother-in-law being then armed each with a gun. Murphy thereupon demanded to see the appellant. The appellant was then in his father's house, and the father and mother both claimed that he was not there, Murphy asserting that he was, and demanding that he should be produced. He started into the house angry and making more or less demonstrations of intended violence to the appellant. Thereupon he was restrained by his wife, who induced him to then leave the Jackson place and return to his own home, which was only a few hundred yards distant from Jackson's. On this occasion, Isaiah Jackson, appellant's father, apparently conceded that the appellant had shot Murphy's dog and deplored the fact, and offered to pay him $25 damages thereabouts, which was refused by Murphy, and he thereupon suggested and rather insisted that Murphy file a complaint against the appellant, prosecute and convict him for shooting the dog, and make him pay a fine therefor. This was declined by Murphy, and upon being asked what would satisfy him, the testimony shows that he stated that nothing but the fact of his removal from that county would satisfy him. Upon being asked by Jackson how long he would have to remain away, he replied, just as long as he (Murphy) lived in the county; that he would not permit him to live in that county; and on this occasion, he stated that if he did not leave "he is my negro and I am going to have him." All of this was heard by or communicated at once to the appellant. The testimony

shows that it had the effect of alarming him and his father and mother for his safety; that in order to avoid Murphy, the father had him to go into Corsicana, a few miles distant, where he stayed a day and night with a relative, and they were discussing the necessity of his having to remove and of his father being without his services for the year 1910. His father thereupon took the matter to Witherspoon, his landlord, and discussed it with him. Witherspoon, a white man, advised the appellant and his father that he thought they were needlessly alarmed, and advised him to return to his father's house, but to keep out of the view of the deceased for a few days until the deceased became quieted. Thereupon the appellant did return to his father's house, remained the following night and day, somewhat quietly secreted so as to keep out of the view of the deceased. In going to and from his work it was necessary for Murphy to pass somewhat near by the house of Jackson. There were two ways of going, the nearer across the field, which was sometimes done by Murphy, and the other close in front of Jackson's house, which was the longer way, but also sometimes pursued by Murphy because of avoiding the muddy and sloppy way. The way in front of Jackson's house was not exactly a public road, but was a road used for passing to and fro.

The killing occurred soon after dinner about 1:30 p. m. Shortly prior to the killing, one Kelley, a negro preacher, came to the house of appellant's father, and upon being bantered by appellant, he engaged with him at shooting at a target with a little target rifle. Some fifteen shots were fired alternately by Kelley and appellant at the target. Just about the time they got through with this target shooting, Murphy was passing Jackson's house, armed with a double barrel shotgun. The appellant claims he did not know that Murphy was passing until immediately before the shooting. After exhausting the cartridges of the target rifle, he claims to have gone into his father's house and got his Winchester rifle, with the intention of himself and Kelley shooting that at the target, and just as he stepped out of the back part of his father's house with the Winchester rifle, he saw Murphy with his double barrel shotgun. The theory of the State was that the appellant saw Murphy as he was coming and went into the house and procured the Winchester rifle for the purpose of killing him. The theory of the appellant was as stated above, that he got the Winchester rifle, had not seen Murphy before, and as he stepped out for the purpose of using it with Kelley in firing at the target, discovered Murphy. The testimony then is conflicting.

Kelley, appellant, and appellant's mother testified that Murphy started directly towards appellant when the appellant hailed him and asked him where he was going. He made no reply, but instead, shifted his double barrel shotgun from his left hand to his right, immediately placed it to his shoulder and fired at and hit the appellant with small shot. That immediately the appellant fired, and then alternately

Murphy and he again fired. The testimony shows clearly that Murphy fired both barrels of his shotgun at the appellant and struck him with shot both times. The testimony of the State tended to show that the appellant shot first, and then they alternated shooting at one another. The testimony of the appellant tends to show that the appellant was very much alarmed and was afraid of the deceased continuously from the time he was charged by deceased with shooting his dog, and that he was endeavoring during all this time to keep secreted and out of the view of the deceased to avoid being killed, or having some serious injury inflicted upon him.

We have thus given a brief summary of the evidence so as to show the different contentions of the State and the appellant.

6. Several bills of exception were reserved by the appellant to the court's action in refusing to permit the testimony of Isaiah Jackson and others to show that the appellant was very much alarmed and feared the deceased, and was contemplating removing from his father's and out of the county so as to avoid being killed or injured by the deceased. Without reciting this testimony that was rejected, and the various bills that raised it, it is our opinion that this character of testimony was admissible, and that the court erred in excluding it. Even the testimony that was admitted, in our opinion, clearly raised the question of manslaughter and required the court to charge thereon. This was insisted upon by appellant in the court below, properly saved by bills of exception, and set out as grounds of his motion for a new trial. We think it would be useless to take up each of these several bills of exception as to the exclusion of this testimony, for what we have said above, in our opinion, shows that the further testimony which was excluded should have been admitted, and that even what was admitted with what was excluded, clearly raised the issue of manslaughter, and the court erred in not charging thereon.

7. Another bill of exceptions by appellant shows that he offered testimony to show that the deceased had failed to pay a part of the rent to Isaiah Jackson for the said house rented by Isaiah Jackson to deceased for 1909, and that a controversy or some feeling arose between them thereabouts. There was no error committed by the court in refusing to admit this testimony.

8. With the qualification made by the court in allowing appellant's bill of exceptions taken to the refusal of the court to permit Isaiah Jackson to testify that he heard from others that the deceased was not going to get out of the house and give Jackson possession thereof, there was no error in excluding same.

9. By bill of exception No. 19, it is shown that the court permitted Mrs. Murphy, the wife of the deceased, to testify in effect that when she got to the deceased, he was still alive and rational, and that when she got there she kissed him and asked him if he knew her; that he replied, "Get the doctor as quick as you can." She then assured

him that she had sent for the doctor and would get him there as soon as she could. She then asked him if he wanted to go to 'the house. She understood his reply to be to take him easy, and she supposed that he realized his condition and that he was not going to live, because it was but a few seconds until he told her to kiss him goodby, and she did so and he died before he was moved. Objection was made to the introduction of all of this, and especially of the fact that she had kissed him when she first or soon after she reached him, and then he requested her to kiss him goodby, which she did, for many reasons, among them, that it was not a dying declaration of the deceased, as what he said and what was done, did not tend to show anything about the cause or the facts of the killing, and it was a conversation and acts between the deceased and his wife when the appellant was not present, and would have a tendency to prejudice the rights of the appellant and stir the emotions of the jury against him, and inflame their minds, and would be the occasion, which was done, of unfairly and improperly appealing to the sympathies of the jury. Our opinion is that this evidence was clearly inadmissible on all of the grounds objected to at the time.

10. Other bills show that the appellant objected to the introduction of the garments the deceased wore when he was shot. The theory of the State, attempted to be supported by the introduction of these articles of clothing, was to show that the appellant's testimony, and that of his witnesses, as to the position of deceased's gun at the time he was shot and that the appellant shot first and not the deceased, in our opinion, was admissible. The qualification of the bills shows that the bloody portions of the garments were cut away, leaving only substantially that portion of the clothing where the shots passed through. Such testimony was admissible for the purpose for which it was offered and introduced by the State.

11. Another bill by the appellant was to the exclusion of the testimony of appellant's father of what the appellant told him when he first saw him sometime after the killing. In our opinion, this testimony was properly excluded; it was not res gestae.

12. Several bills complain of the argument of the county attorney. This court again calls attention to the fact that the attorneys representing the State must stay within the record in the argument, and not use inflammatory language in their arguments. However, it is perfectly legitimate for the State's counsel to insist upon the infliction of the death penalty where the evidence justifies it, and they clearly have the right to argue from the testimony which was introduced and from the record, such matters before the jury.

13. The appellant insists that the court erred in charging on the subject of threats by the deceased against the appellant. A charge on this subject is, of course, a separate and distinct matter from that of self-defense. Our opinion is that the record in this case shows

that the court was called upon to charge on the subject of threats, and there was no error in the court giving a correct charge on that subject applicable to the evidence introduced.

As stated above, it is unnecessary to give all of the several bills of exception and the many questions raised by this record. We have given a sufficient indication of what is admissible and what not, and of the several charges to be given, and of the defects in some of them as complained of by the appellant.

For the errors above pointed out, the judgment is reversed and the cause is remanded.

<em>Reversed and remanded.</em>