FILED
15-0661
8/31/2015 11:09:15 PM
tex-6735480
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

**NO.** 15-0661 _____

# In the Supreme Court of Texas

# *IN RE* AMELIA V. KELLY,

*Relator*

ORIGINAL PROCEEDING FROM CAUSE NO. 11CV0325
122ND DISTRICT COURT OF GALVESTON COUNTY, TEXAS
HON. JOHN ELLISOR PRESIDING

**PETITION FOR WRIT OF MANDAMUS**

SMITH LAW GROUP LLLP
Maitreya Tomlinson
State Bar No. 24070751
maitreya@appealsplus.com
1250 Capital of Texas Hwy South
Three Cielo Center, Suite 601
Austin, Texas 78746
(512) 439-3230
(512) 439-3232 (fax)

*Counsel for Relator*
*Amelia V. Kelly*

## IDENTITY OF PARTIES AND COUNSEL

**Relator:**

Amelia V. Kelly

**Appellate Counsel for Relator:**

Maitreya Tomlinson
SMITH LAW GROUP LLLP
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, Texas 78746

**Trial Counsel and Former Appellate Counsel for Relator:**

George F. May
TWOMEY MAY, PLLC
2 Riverway, 15th Floor
Houston, Texas 77056

**Trial Counsel for Relator:**

Larry A. Vick
LAW OFFICES OF LARRY A. VICK
908 Town & Country Blvd., Suite 120
Houston, Texas 77024

**Real Party in Interest:**

Matthew D. Wiggins, Jr.

**Trial and Appellate Counsel for Real Party in Interest:**

Timothy A. Beeton
SIMPSON & BEETON
2200 Market Street, Suite 801
Galveston, Texas 77550

George W. Vie, III
MILLS SHIRLEY, LLP
2228 Mechanics Street
Galveston, Texas 77550

i

**Respondent:**

The Honorable John Ellisor
122nd Judicial District Court
600 59th Street, Suite 4304
Galveston, Texas 77551

# TABLE OF CONTENTS

Identity of Parties and Counsel ...............................................................................i

Index of Authorities ........................................................................................ vii

Record and Appendix...........................................................................................1

Statement of the Case...........................................................................................2

Statement of Jurisdiction.......................................................................................4

    1.      Does a trial court abuse its discretion by ordering a residence's foreclosure and sale, and is that order void when:

        a.      the trial court's plenary power has expired;

        b.      the party seeking foreclosure merely filed a motion to foreclose;

        c.      the trial court's final judgment did not order foreclosure or provide any devices for the moving party to enforce the lien;

        d.      the judgment stated that the property owner intended to reside in the property;

        e.      the judgment and pleadings did not indicate the lien was a lien that constituted an exception to homestead protection;

        f.      the trial court did not hold a trial or conduct any evidentiary hearings; and

        g.      the trial court, and the moving party, treat the lien like a loan with a deadline for its payoff and the judgment does not?

    2.      Does a trial court abuse its discretion by ordering a property's foreclosure and sale when:

a. the trial court acknowledged that the property was a homestead;

b. the trial court applied the purchase money exception to a lien that only included the lien beneficiary's purchase money expended at an earlier foreclosure sale;

c. the trial court applied the work-and-materials exception when there was no written contract for the work and materials and the lien beneficiary performed the work after he purchased the property at an earlier foreclosure sale;

d. the trial court did not hold a trial or conduct any evidentiary hearings on potential fact issues regarding homestead protection; and

e. this Court and other courts have held analogous orders invalid.

3. Does a trial court abuse its discretion and violate constitutional due process and due course of law protections when:

a. it orders foreclosure and sale on a property that it acknowledges as a person's homestead; and

b. it does so without a trial or without holding evidentiary hearings?

4. Does a trial court abuse its discretion by ordering foreclosure and the sale of real property two years after issuing a judgment in which it created a judicial lien in rem that need not be satisfied until the property is conveyed?

5. Has a relator satisfied the no-adequate-remedy requirement when:

a. the trial court issued an inconsistent order after its plenary power expired; and

b. the relator has no means to otherwise complain about the order?

Issues Presented ...................................................................................................4

Why the court should grant mandamus ...............................................................6

Statement of Facts ...............................................................................................7

Argument and Authorities...................................................................................13

    I.      Standards of Review..........................................................................13

    II.    The Trial Court Abused Its Discretion by Issuing a Void Foreclosure Order.........................................................................14

        A.    The Trial Court Abused Its Discretion by Issuing Its Foreclosure Order Without Jurisdiction ...................................14

        B.    The Trial Court Abused Its Discretion by Issuing a Foreclosure Order on Kelly's Homestead ...............................18

        C.    The Trial Court Abused Its Discretion by Violating Constitutional Due Process and Due Course of Law Protections.....................................................................................21

        D.    The Trial Court Issued a Relatively Unique Judgment that Created a Lien on 701 Bay, Which Need Not Be Satisfied Until Kelly Conveys the Property.............................22

    III.   Kelly Has No Adequate Remedy .....................................................24

Prayer ..................................................................................................................24

Rule 52.3(j) Certification.....................................................................................26

Rule 9.4(i) Certificate of Compliance.................................................................26

Certificate of Service ..........................................................................................27

Appendix ..................................................................................................... *post*

    Order of Judicial Foreclosure (signed June 23, 2014)..........................Tab A

    Final Judgment (signed June 22, 2012)...................................................Tab B

    Writ of Execution and Order of Sale (dated August 26, 2014)...............Tab C

TEX. CONST. art. XVI, § 50.......................................................................Tab D

TEX. PROP. CODE § 41.001 ....................................................................... Tab E

TEX. PROP. CODE § 53.254..................................................................... Tab F

U.S. CONST. amend. XIV.........................................................................Tab G

TEX. CONST. art. I § 15. .........................................................................Tab H

TEX. CONST. art. I § 19. ......................................................................... Tab I

# INDEX OF AUTHORITIES

**Cases**

*Bank One, N.A. v. Wohlfahrt*,
193 S.W.3d 190 (Tex. App.—Houston [1st Dist.] 2006, no pet.)..................16

*Bell v. Jones*,
139 P.2d 884 (Utah 1943).........................................................................16

*Curtis Sharp Custom Homes, Inc. v. Glover*,
701 S.W.2d 24 (Tex. App.—Dallas 1985, writ ref'd n.r.e)...........................20

*Custom Corporates, Inc. v. Sec. Storage, Inc.*,
207 S.W.3d 835 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ..............14

*Gilmore v. Dennison*,
131 Tex. 398, 115 S.W.2d 902 (1938) ......................................................21

*Great Bay Condo.,Owners Ass'n v. Merryman*,
No. ST-07-CV-0546, 2010 WL 7371946 (V.I. Aug. 9, 2010).....................16

*Heggen v. Pemelton*,
836 S.W.2d 145 (Tex. 1992) ............................................................. 18, 20

*In re Adan Volpe Props., Ltd.*,
No. 04-14-00615-CV, 2014 WL 7437005 (Tex. App.—San
Antonio Dec. 31, 2014, orig. proceeding [mand. denied]).............................14

*In re Kelly*,
No. 14-14-00789-CV, 2014 WL 5492809 (Tex. App.—Houston
[14th Dist.] Oct. 30, 2014, orig. proceeding) ............................................3, 12

*In re Kelly*,
No. 14-14-00944-CV, 2014 WL 7524979 (Tex. App.—Houston
[14th Dist.] Nov. 26, 2014, orig. proceeding) ...........................................3, 12

*In re Marriage of Christodolou*,
383 S.W.3d 718 (Tex. App.—Amarillo 2012, no pet.)................................19

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004) ............................................................. 13, 14

*In re Vaishangi, Inc.*,
442 S.W.3d 256 (Tex. 2014) .................................................................. 13, 24

*Inwood N. Homeowners' Ass'n, Inc. v. Harris*,
736 S.W.2d 632 (Tex. 1987) ....................................................................18

*Johnson v. Fourth Court of Appeals*,
700 S.W.2d 916 (Tex. 1985) (orig. proceeding) ...........................................13

*Katz v. Bianchi*,
848 S.W.2d 372 (Tex. App.—Houston [14th Dist.] 1993, no writ).............23

*Kelly v. Wiggins*,
No. 14-14-00605-CV, 2015 WL 2169519 (Tex. App.—Houston
[14th Dist.] May 7, 2015, no. pet.) .................................................. 3, 9, 12, 24

*Kendall Builders, Inc. v. Chesson*,
149 S.W.3d 796 (Tex. App.—Austin 2004, pet. denied) ..............................21

*Millikin v. Jeffrey*,
117 Tex. 152, 299 S.W. 397 (1927) ...........................................................14

*Moser v. Schachar*,
No. 4:14-CV-185, 2015 WL 679689 (E.D. Tex. Feb. 17, 2015) ..................22

*Perry v. Del Rio*,
66 S.W.3d 239 (Tex. 2001) (quoting *Walker*, 827 S.W.2d at 842)...............13

*Salomon v. Lesay*,
369 S.W.3d 540 (Tex. App.—Houston [1st Dist.] 2012, no pet.)................18

*Spradlin v. Jim Walter Homes, Inc.*,
34 S.W.3d 578 (Tex. 2000) ......................................................................19

*Stephens v. LPP Mortgage, Ltd.*,
316 S.W.3d 742 (Tex. App.—Austin 2010, pet. denied) ..............................16

*Vackar v. Patterson, Boyd, Lowery, Anderholt & Peterson, P.C.*,
866 S.W.2d 817 (Tex. App.—Beaumont 1993, no writ) ..............................17

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ....................................................................13

viii

*Walter v. Marathon Oil Corp.*,
  422 S.W.3d 848 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ..............24

**Statutes**

Tex. Const. art. I § 19.................................................................................21

TEX. CONST. art. I, § 15.............................................................................21

TEX. CONST. art. V, § 3 .............................................................................4

TEX. CONST. art. XVI, § 50(a) ............................................................ 18, 19

TEX. CONST. art. XVI, § 50(a)(1).............................................................19

TEX. CONST. art. XVI, § 50(a)(5).............................................................19

TEX. GOV'T CODE § 22.002(a) ..................................................................4

TEX. PROP. CODE § 41.001 ................................................................. 18, 19

TEX. PROP. CODE § 41.001(b)(1)..............................................................19

TEX. PROP. CODE § 41.001(b)(3)..............................................................19

U.S. CONST. amend. XIV ...........................................................................21

 **Rules**

TEX. R. APP. P. 52.7(a)................................................................................1

TO THE HONORABLE SUPREME COURT OF TEXAS:

Relator Amelia V. Kelly files this petition for writ of mandamus requesting relief from the trial court's June 23, 2014 order granting judicial foreclosure and providing an order of sale. Although Matthew D. Wiggins sued for foreclosure in a related proceeding, he filed a motion in the complained-about court and obtained judicial foreclosure and an order of sale on what was Kelly's homestead. The trial court did so without adjudicating the issues and in contravention of its final order. Despite its characterization as an enforcement order, the June 23, 2014 order does not comport with the trial court's final judgment. The order's issuance is incongruent with Texas homestead rights, and it raises due process concerns. Consequently, Kelly requests the Court to declare the order void. Kelly also respectfully shows:

## RECORD AND APPENDIX

Relator is filing a separate sworn mandamus record, which is cited by page number in this petition (*e.g.*, MR ___). The record contains certified copies of all documents filed in Cause No. 11CV0325 and properly authenticated transcripts from the relevant hearings. *See* TEX. R. APP. P. 52.7(a). The appendix is attached to this petition and is cited by tab (*e.g.*, App'x. ___).

## STATEMENT OF THE CASE

*Underlying Proceeding:* The underlying case is styled *Amelia V. Kelly v. Matthew D. Wiggins, Jr. and D.L. Hammaker*, Cause No. 11CV0325 in the 122nd Judicial District Court of Galveston County, Texas.

*Nature of Case and Ruling at Issue:* This case involved a successful wrongful foreclosure claim against Wiggins. It also included Wiggins' counterclaim seeking reimbursement for the amounts he expended to purchase the property at the foreclosure sale and the amounts he expended to preserve and improve the property after the wrongful foreclosure.

In June 2012, the trial court issued a judgment reflecting that Kelly intended to reside at the wrongfully foreclosed property. The judgment also ordered that the property's title remain vested in Kelly's name, free and clear of any liens and claims asserted by a party subject to, among other things, a lien against the property for the amounts claimed by Wiggins. The judgment further provided Kelly legal avenues to enforce the judgment, but did not order the same for Wiggins.

Just over two years later, even though Wiggins had not sued to foreclose, the trial court issued an order purportedly judicially foreclosing on the homesteaded property.

*Respondent:* Hon. John Ellisor, Judge of the 122nd Judicial District Court of Galveston County, Texas.

| | |
|---|---|
| *Relief Sought:* | Relator seeks a writ of mandamus either declaring the trial court's June 23, 2014 foreclosure order void or vacating the order. |
| *Court of Appeals and the Supreme Court of Texas:* | Since the trial court issued the foreclosure order, Kelly has filed two relevant mandamus petitions in the Fourteenth District Court of Appeals. She has also filed, concurrently with her second mandamus petition, a direct appeal in the same court. Additionally, Kelly filed a mandamus petition in this Court for the limited purpose of instructing the appeals court to issue a stay. |
| *Court of Appeals' Dispositions:* | *In re Kelly*, No. 14-14-00789-CV, 2014 WL 5492809, at *1 (Tex. App.—Houston [14th Dist.] Oct. 30, 2014, orig. proceeding). The court denied mandamus without any substantive explanation. |
| | *In re Kelly*, No. 14-14-00944-CV, 2014 WL 7524979, at *1 (Tex. App.—Houston [14th Dist.] Nov. 26, 2014, orig. proceeding). The court noted the filings' similarity to Kelly's previous mandamus petition. And, it similarly denied mandamus without any substantive explanation. |
| | *Kelly v. Wiggins*, No. 14-14-00605-CV, 2015 WL 2169519, at *3-4 (Tex. App.—Houston [14th Dist.] May 7, 2015, no. pet.). The court determined it lacked jurisdiction and dismissed the appeal. Its opinion, however, suggested why the court decided to deny Kelly's mandamus petitions. |

3

*Supreme Court of Texas'*
*Disposition:*
In No. 15-0004, this Court denied Kelly's request for mandamus relief involving her sought-after stay.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this original proceeding under Article V, Section 3 of the Texas Constitution and Section 22.002 of the Texas Government Code. *See* TEX. CONST. art. V, § 3; TEX. GOV'T CODE § 22.002(a).

## ISSUES PRESENTED

1.     Does a trial court abuse its discretion by ordering a residence's foreclosure and sale, and is that order void when:

    a.     the trial court's plenary power has expired;

    b.     the party seeking foreclosure merely filed a motion to foreclose;

    c.     the trial court's final judgment did not order foreclosure or provide any devices for the moving party to enforce the lien;

    d.     the judgment stated that the property owner intended to reside in the property;

    e.     the judgment and pleadings did not indicate the lien was a lien that constituted an exception to homestead protection;

    f.     the trial court did not hold a trial or conduct any evidentiary hearings; and

    g.     the trial court, and the moving party, treat the lien like a loan with a deadline for its payoff and the judgment does not?

2.     Does a trial court abuse its discretion by ordering a property's foreclosure and sale when:

    a.     the trial court acknowledged that the property was a homestead;

4

b. the trial court applied the purchase money exception to a lien that only included the lien beneficiary's purchase money expended at an earlier foreclosure sale;

c. the trial court applied the work-and-materials exception when there was no written contract for the work and materials and the lien beneficiary performed the work after he purchased the property at an earlier foreclosure sale;

d. the trial court did not hold a trial or conduct any evidentiary hearings on potential fact issues regarding homestead protection; and

e. this Court and other courts have held analogous orders invalid.

3. Does a trial court abuse its discretion and violate constitutional due process and due course of law protections when:

a. it orders foreclosure and sale on a property that it acknowledges as a person's homestead; and

b. it does so without a trial or without holding evidentiary hearings?

4. Does a trial court abuse its discretion by ordering foreclosure and the sale of real property two years after issuing a judgment in which it created a judicial lien in rem that need not be satisfied until the property is conveyed?

5. Has a relator satisfied the no-adequate-remedy requirement when:

a. the trial court issued an inconsistent order after its plenary power expired; and

b. the relator has no means to otherwise complain about the order?

5

## WHY THE COURT SHOULD GRANT MANDAMUS

Without jurisdiction, the trial court issued a foreclosure order and an order of sale on Relator's homestead that altered a two-year-old final judgment. Assuming that the trial court had jurisdiction, it acknowledged that the subject property was a homestead, but clearly misapplied law that obviates that protection. The trial court also ordered the property's sale without trying the homestead issues or accepting any evidence.

Mandamus relief is important here because trial courts should never issue orders without jurisdiction. Allowing them to do so would provide trial courts with unfettered authority. Further, preserving a person's residential property is so paramount in Texas that homesteads are constitutionally protected. Allowing a trial court to improperly foreclose on a homestead not only negates the will of the people, it unconstitutionally deprives a person of their home. Lastly, issues like homestead protection require evidence and proper adjudication. Here, the trial court allowed a woman's home to be taken away through simple motion practice and non-evidentiary hearings. Constitutionally protected property should not be wrested from someone's hands so expediently.

**STATEMENT OF FACTS**

**The 2012 Case:** Matthew D. Wiggins conducted a non-judicial foreclosure sale on 701 Bay Avenue in Kemah, Texas, a property owned by Amelia V. Kelly. MR6. He also purchased the property at the foreclosure sale. *Id.* Wiggins later claimed that he paid to preserve and improve the property, which occurred after his foreclosure purchase. *See id.*; MR48.

Kelly subsequently sued Wiggins and a purported substitute trustee, D.L. Hammaker for, among other things, wrongfully foreclosing on 701 Bay. MR74, 57-74. Kelly also pleaded that 701 Bay was her homestead.[1] MR74.

In response, Wiggins made multiple counterclaims, including that the trial court should hold Kelly's potential interest in 701 Bay subject to a "claim for reimbursement for all amounts spent by him to purchase, preserve, and improve the property . . ." at, and after, the wrongful foreclosure. *See* MR48. Wiggins also claimed that those amounts should constitute a lien on Kelly's interest in the property. *Id.* He did not seek foreclosure. *See* MR46-56.

---

[1]    In fact, during the relevant times, Kelly has claimed and evidence has supported that 701 Bay was her homestead. Kelly has steadfastly maintained that 701 Bay is her homestead. MR74, 78-92, 99, 108-12, 114-27, 129-31 134-35). She has also filed briefing and other documents, and submitted evidence, supporting that 701 Bay is her homestead. *See id.* Unsurprisingly, the jury determined that Kelly intended to reside at 701 Bay. MR168. And, the trial court impliedly acknowledged that 701 Bay was Kelly's homestead when it applied an exception to homestead protection and issued the foreclosure order. *See* MR173, 175.

**The Unorthodox 2012 Final Judgment and Subsequent Appeals:** The trial court signed its final judgment on June 22, 2012. MR176-82; App'x. B. In it, the trial court declared that Wiggins' foreclosure was void and that title did not pass from Kelly to Wiggins. MR179; App'x. B. The trial court also stated that Wiggins' right, title, and interest in 701 Bay remain vested in Kelly. MR179-80; App'x. B. Relevantly, however, the trial court included the following language:

> It is further ORDERED, ADJUDGED AND DECREED that the Subject Property is free and clear of any liens and claims of any party to this cause, subject only to (1) a lien against the Property created by this Judgment in favor of [Wiggins] in the amount of $660,000.00 found by the jury for the purchase, preservation and improvement of the property....

> It is further ORDERED, ADJUDGED AND DECREED that [Kelly] shall have all such Writs and Orders as shall become, in [Kelly's] behalf, necessary to enforce the execution hereof . . . and [Wiggins] is divested of all right, title and interest in the Property.

MR180; App'x. B.

The trial court's judgment accorded with Wiggins' requested relief in some manners, but diverged in others. For example, because Wiggins did not plead a foreclosure claim, the trial court did not provide him with one. *Compare* MR46-56, *with* MR176-82; App'x. B. The judgment, however, diverged from Wiggins' sought-after relief when it did not provide him a lien on Kelly's interest in 701 Bay. *Compare* MR48, *with* MR179-80; App'x. B.

8

Instead, the judgment explicitly (and oddly) created a lien in Wiggins' favor against the property itself after declaring that 701 Bay "is free and clear of any liens and claims of any party to [the case]...." MR179-80; App'x. B. It did not supply Wiggins with devices necessary for foreclosing or executing on the lien, nor did it impose liability for the lien on Kelly. *See* MR176-82; App'x. B.

While both parties appealed the judgment, they later abandoned those appeals. MR183-208); *see also Kelly*, 2015 WL 2169519, at *2 (providing links to orders dismissing appeals).

**Wiggins' Attempts to Foreclose and His Successful Attempt to Transfer a Related Case to Respondent's Court:** Since the 2012 judgment, Wiggins has repeatedly tried to non-judicially foreclose on 701 Bay, which prompted Kelly to seek bankruptcy protection. MR99, 110, 223, 294, 384-85, 410-12 Wiggins' attempted foreclosures also precipitated Kelly filing a successful suit in the 405th District Court, Galveston County, Texas (No. 13-CV-1392), to obtain a temporary restraining order and injunctions to prevent any further attempts. MR302-83.

After removing the case to the bankruptcy court, Wiggins filed a counterclaim for judicial foreclosure on 701 Bay. MR294-301, 384-91. He later requested that the 405th District Court transfer the case to the Respondent's court. MR412, 443. When the 405th District Court denied the request, he successfully persuaded the Administrative Judge to transfer the case. *See id.*

9

**The 2014 Foreclosure Proceeding and Order:** Even though Wiggins had counterclaimed for judicial foreclosure in a related suit, he filed a motion purportedly seeking to enforce the 2012 final judgment. MR463-79. He also sought an order for judicial foreclosure. *Id.* In his motion, Wiggins premised his sought-after relief on the assumption that the judgment required Kelly to pay him $660,000 and that she satisfy that liability within a reasonable amount of time. *See* MR464-65.

Kelly responded by asking the trial court to abate the motion because Wiggins had an active, first-filed foreclosure counterclaim in a related matter. MR98-101. She also requested that the trial court dismiss the motion because it lacked jurisdiction to alter its 2012 final judgment. MR101-02. The trial court denied both requests. MR480.

Kelly further responded that there was no existing judgment allowing for 701 Bay's forced sale. She also made the following arguments: (1) the trial court's plenary power to alter its 2012 judgment had expired; (2) the trial court could not foreclose on 701 Bay because it was Kelly's homestead; (3) the trial court could not apply the purchase money exception to the homestead protection because none of the $660,000 lien constituted Kelly's purchase money; (4) the trial court could not foreclose without Wiggins filing a lawsuit and receiving a new judgment; and

(5) Kelly's homestead protection exempted 701 Bay from a forced sale by execution. MR108-12.

The trial court conducted two hearings related to Wiggins' motion, but neither was evidentiary. *See* MR492-526. After conducting the two hearings, the trial court sent a letter to the parties stating that "it is likely that no 'homestead protection' will apply because "the lien was determined to be for [701 Bay's] 'purchase, preservation and improvement....'" MR173. The trial court later issued an order, signed on June 23, 2014, granting Wiggins motion and judicially foreclosing on the $660,000 lien. MR482; App'x. A. It also directed the district clerk to issue an order of sale. *Id.*

In August 2014, the trial court issued findings of fact and conclusions of law. MR 174-75. Relevantly, the trial court included the following conclusions of law: (1) the trial court has the power to enforce its judgments; (2) Kelly had "not paid any sum to release or otherwise satisfy the lien against [701 Bay]..."; (3) no homestead protection applied because the lien was "for [701 Bay's] purchase, preservation and improvement..."; and (4) Wiggins was entitled to a foreclosure order and an order of sale. MR175. Pursuant to the foreclosure order, the district clerk issued a writ of execution and order of sale. MR483-84; App'x. C.

**Kelly's Post-2014 Foreclosure Order Appellate Filings:** Kelly filed her first mandamus petition in October 2014, complaining about the trial court's

foreclosure order. *In re Kelly*, 2014 WL 5492809, at *1. She filed a second petition in November 2014, after the sheriff's office had set a date to auction off 701 Bay. *See In re Kelly*, 2014 WL 7524979, at *1. In an abundance of caution, Kelly also filed a direct appeal on the same day. *See Kelly*, 2015 WL 2169519, at *2. Kelly later filed a mandamus petition (15-0004) in this Court in January 2015, exclusively asking the Court to stay proceedings below while Kelly completed her appeals. *See* MR209-93.

By the end of November 2014, the Fourteenth Court had denied both petitions. *In re Kelly*, 2014 WL 5492809, at *1; *In re Kelly*, 2014 WL 7524979, at *1. It later, in May 2015, determined it lacked jurisdiction over the direct appeal and issued an opinion. *Kelly*, 2015 WL 2169519, at *3-4. This Court also denied Kelly her requested stay. *See* MR488-91.

After considering whether to file any motions for rehearing or en banc reconsideration, Kelly hired the undersigned counsel to review her case and evaluate her appellate options.

**701 Bay's Recent Foreclosure Sale:** Since the Fourteenth Court issued its opinion, Wiggins has again purchased the property at a foreclosure sale.

## ARGUMENT AND AUTHORITIES

### I.     Standards of Review

A writ of mandamus is available when a trial court clearly abuses its discretion and a relator has no adequate remedy at law. *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). A trial court clearly abuses its discretion when "'it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Id.* (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding)). A trial court has no discretion when it comes to "determining what the law is or applying the law to the facts." *Id.* at 840.

Generally, an adequate legal remedy exists if the relator can raise the complaint on appeal. *Id.* The question to ask, however, is whether "any benefits to mandamus review are outweighed by the detriments." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004). Ultimately, an appellate remedy "is inadequate, justifying the issuance of mandamus relief, 'when the parties stand to lose their substantial rights.'" *Perry v. Del Rio*, 66 S.W.3d 239, 257 (Tex. 2001) (quoting *Walker*, 827 S.W.2d at 842).

Relators, however, do not need to show they lack adequate remedies on appeal when trial courts exceed their jurisdiction and issue void orders. *In re Vaishangi, Inc.*, 442 S.W.3d 256, 261 (Tex. 2014). Mandamus is also available

when trial courts do not afford litigants due-process rights, particularly when they deny a party's right to adjudicate material issues by jury trial. *See Prudential*, 148 S.W.3d at 139; *cf. Millikin v. Jeffrey*, 117 Tex. 152, 154, 299 S.W. 397, 398 (1927).

## II. The Trial Court Abused Its Discretion by Issuing a Void Foreclosure Order

### A. The Trial Court Abused Its Discretion by Issuing Its Foreclosure Order Without Jurisdiction

The trial court lacked jurisdiction to issue its 2014 foreclosure order. Trial courts may not issue enforcement orders that are inconsistent with their original judgments after their plenary power has expired. *In re Adan Volpe Props., Ltd.*, No. 04-14-00615-CV, 2014 WL 7437005, at *3 (Tex. App.—San Antonio Dec. 31, 2014, orig. proceeding [mand. denied]). They also may not issue orders that materially change the original judgment's substantive adjudicative portions. *Custom Corporates, Inc. v. Sec. Storage, Inc.*, 207 S.W.3d 835, 839 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Additionally, a postjudgment enforcement order may not require a party to perform obligations that the trial court does not impose in its final judgment. *In re Adan Volpe Props.*, 2014 WL 7437005, at *3. If a trial court issues an enforcement order that violates these standards, the order is void. *Id.*, at *3-4.

The trial court's 2014 foreclosure order is void. The trial court's plenary power to alter its 2012 final judgment has expired. *Compare* MR181; App'x. B, *with* MR482; App'x. A. The trial court's foreclosure order, however, (1) is inconsistent with its 2012 final judgment; (2) materially changes substantive adjudicated portions of the judgment; and (3) impermissibly requires a performance of obligations not imposed by judgment. *See id.*

The trial court's 2014 foreclosure order is inconsistent with its final judgment. As described below in Part II.D, the trial court's foreclosure order materially changes the 2012 judgment's language by foreclosing on a lien before 701 Bay is conveyed. *See id.* The trial court's foreclosure order also materially changes its homestead determination and the meaning of "purchase" and "improvement" as adjudicated in 2012. *See id.*

The trial court's 2014 foreclosure order is also inconsistent for other reasons. In its 2014 order, the trial court ordered 701 Bay's foreclosure and provided Wiggins an order of sale. MR482; App'x. A. The final judgment, however, did not order the property's foreclosure. MR176-82; App'x. B. While the judgment explicitly provided Kelly rights of enforcement, it did not provide Wiggins any such rights. *See id.* The judgment, and the pleadings, also do not reflect that Wiggins sued for foreclosure or that the trial court adjudicated foreclosure when it decided 701 Bay's ownership status. *Compare id.*; App'x. B, *with* MR46-56.

Assuming that Wiggins could judicially foreclose on the judgment lien, he needed to sue for foreclosure and receive a judgment. *See Stephens v. LPP Mortgage, Ltd.*, 316 S.W.3d 742, 746 (Tex. App.—Austin 2010, pet. denied) (explaining that lien holder may adjudicate lien and then later sue to foreclose it). The trial court cannot rewrite its judgment to skip adjudicating foreclosure to provide Wiggins relief.

To the extent that Wiggins argues that the 2014 foreclosure order is consistent because he could, and did, foreclose through an execution sale, the argument should fail because the 2012 judgment did not order foreclosure. When a final judgment does not order foreclosure, subsequent writs of execution exceed the final judgment's scope. *See, e.g.*, *Great Bay Condo.,Owners Ass'n v. Merryman*, No. ST-07-CV-0546, 2010 WL 7371946, at *2 (V.I. Aug. 9, 2010) (citing *Bank One, N.A. v. Wohlfahrt*, 193 S.W.3d 190, 194-95 (Tex. App.— Houston [1st Dist.] 2006, no pet.) and *Bell v. Jones*, 139 P.2d 884, 885 (Utah 1943)). Here, the trial court did not order foreclosure in its final judgment. *See* MR176-82; App'x. B. The judgment only provided Kelly with the right to enforce the judgment's execution though any necessary writs or orders. MR180; App'x. B. Reading it to afford Wiggins with the right to enforce the judgment through an execution sale would impermissibly rewrite the judgment's language after the trial court's plenary power has expired. A writ of execution, therefore, would exceed

16

the final judgment's scope; and consequently, it is inconsistent with the final judgment.

Moreover, as will be discussed below, the trial court acknowledged that 701 Bay was Kelly's homestead, which under the circumstances would exempt it from execution. *See, e.g.*, *Vackar v. Patterson, Boyd, Lowery, Anderholt & Peterson, P.C.*, 866 S.W.2d 817, 819 (Tex. App.—Beaumont 1993, no writ) (stating that homesteads are exempt from execution unless the debt is provided for under Texas law).

The trial court's 2014 foreclosure order implicitly required Kelly to perform an obligation that the trial court did not impose on her in its final judgment. More specifically, the trial court's order implicitly, and Wiggins explicitly, treated the judicial lien against 701 Bay as debt that Kelly needed to satisfy. *Compare* MR465 (complaining that Kelly had not made a principal or interest payment on the lien and asserting that she has a reasonable amount of time to do so), *with* MR175 (stating in its conclusions of law that Kelly had "not paid any sum to release or otherwise satisfy the lien…."). The 2012 judgment does not contain any language that required Kelly to satisfy the lien by a certain date. *See* MR176-82; App'x. B; *see also* Part II.D. It also does not order any loan-like terms. *See id.*

**B.     The Trial Court Abused Its Discretion by Issuing a Foreclosure Order on Kelly's Homestead**

Assuming that the trial court had jurisdiction to issue its foreclosure order, it abused its discretion by misapplying law regarding homestead protection. Courts must liberally construe constitutional homestead exemption to further its purposes. *See, e.g.*, *Salomon v. Lesay*, 369 S.W.3d 540, 554 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987)). Accordingly, trial courts may not order foreclosure or the forced sale of homesteaded property to satisfy debts unless the constitution specifically provides the authority. *See* TEX. CONST. art. XVI, § 50(a); TEX. PROP. CODE § 41.001; *Salomon*, 369 S.W.3d at 555 (citing, among others, *Heggen v. Pemelton*, 836 S.W.2d 145, 148 (Tex. 1992)).

The trial court implicitly acknowledged that 701 Bay was Kelly's homestead. In a June 2014 letter to counsel, the trial court stated that it had reviewed the facts and pertinent caselaw. MR173. It also stated that there was likely no homestead protection because the lien was for 701 Bay's "'purchase, preservation, and improvement.'" *Id.* In other words, the trial court decided that the property was Kelly's homestead, but that an exception applied. *See id.* The trial court's findings and conclusions indicate the same. MR175 (stating that "[s]ince the lien was determined to be for the purchase, preservation, and improvement of the property, no 'homestead protection' will apply").

18

The trial court misapplied the exceptions to homestead protection. It concluded that homestead protection did not apply because the lien was for 701 Bay's purchase, preservation, and improvement. *Id.* While not specifying which constitutional or statutory exception applied, based on its conclusion and Texas law, the trial court could only have meant the purchase-money and the work-and-materials exceptions. *Compare id.*, *with* TEX. CONST. art. XVI, § 50(a) and TEX. PROP. CODE § 41.001. Significantly, neither exception could apply here.

Under the circumstances, the purchase money exception is inapplicable. The purchase money exception requires that the lien recipient has lent money to the debtor to purchase the lien-encumbered property. *See* TEX. CONST. art. XVI, § 50(a)(1); *see* TEX. PROP. CODE § 41.001(b)(1); *In re Marriage of Christodolou*, 383 S.W.3d 718, 721 (Tex. App.—Amarillo 2012, no pet.) (citing multiple cases). Here, the "purchase money" was the money Wiggins spent buying 701 Bay, for himself, at the first foreclosure sale. MR6; *see also* MR48 (pleading that the lien would represent reimbursement of funds "spent *by him* to purchase" 701 Bay) (emphasis added).

The work-and-materials exception is also inapplicable because it would require that Wiggins and Kelly had contracted for the work in writing. *See* TEX. CONST. art. XVI, § 50(a)(5); *see* TEX. PROP. CODE § 41.001(b)(3); *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580-81 (Tex. 2000). Wiggins "preserve[d] and

improve[d]" 701 Bay after he bought it at the foreclosure sale. MR6, 48. Kelly did not ask Wiggins to preserve and improve 701 Bay after the property was foreclosed upon, let alone sign a written contract for the same. Even if this were not the case, Wiggins never pleaded, *see* MR46-56, nor did he produce a relevant written contract.

This Court and others have held that analogous orders are invalid. In *Heggen*, a trial court imposed an equitable lien on a homestead to secure a just-and-right division. 836 S.W.2d at 146. Like here, this Court noted that, based on the record, the lien did not fit into a constitutionally allowable exception. *Id.* at 148. It then held that the order imposing the lien was invalid. *See id.* The Court reasoned that permitting the lien's beneficiary to enforce the lien could lead to foreclosure, a result that is contrary to constitutional homestead protection. *Id.* Another appellate court likewise held that a trial court may not enforce an equitable lien imposed by an earlier judgment when the homestead issue was raised, but not disproven in the earlier action. *See Curtis Sharp Custom Homes, Inc. v. Glover*, 701 S.W.2d 24, 24-28 (Tex. App.—Dallas 1985, writ ref'd n.r.e).

The same reasoning should apply here. In the earlier action that culminated with the 2012 final judgment, Kelly pleaded that 701 Bay was her homestead and the jury decided that Kelly possessed the requisite intent for 701 Bay to be her homestead. MR74, 86-90, 178; App'x. B. Further, the trial court included the

jury's homestead finding in its judgment, and later implicitly acknowledged that 701 Bay was Kelly's homestead in a letter and in its findings and conclusions. *See* MR173, 175, 178; App'x. B.

Assuming that the homestead protection had not been adequately established, the trial court still abused its discretion because it would need to determine whether 701 Bay qualified as Kelly's homestead. It would also need to determine if one of the exceptions applied. Both of these inquiries are fact-intensive. *See Gilmore v. Dennison*, 131 Tex. 398, 400, 115 S.W.2d 902 (1938); *see also Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 807-08 (Tex. App.—Austin 2004, pet. denied) (noting that establishing a homestead is a fact issue and implying that courts must determine if contractors complied with TEX. PROP. CODE § 53.254 to determine whether they may judicially foreclose on a homestead). In deciding to issue its 2014 foreclosure order, the trial court held two hearings, but neither was evidentiary. *See* MR492-526. It could not have properly decided the homestead issue and order foreclosure without admitting and weighing evidence.

C.   **The Trial Court Abused Its Discretion by Violating Constitutional Due Process and Due Course of Law Protections**

The trial court facilitated Wiggins' taking of Kelly's homestead property without holding a trial or conducting evidentiary hearings. The trial court, therefore, violated constitutional due process and due course of law protections. *See* U.S. CONST. amend. XIV; *see* TEX. CONST. art. I, §§ 15, 19.

21

**D.** **The Trial Court Issued a Relatively Unique Judgment that Created a Lien on 701 Bay, Which Need Not Be Satisfied Until Kelly Conveys the Property**

The trial court's 2012 judgment is relatively unique in that it creates a lien on 701 Bay that does not need to be satisfied until Kelly conveys the property. In relevant part, the judgment states:

> It is further ORDERED, ADJUDGED AND DECREED that the Subject Property is free and clear of any liens and claims of any party to this cause, subject only to (1) a lien against the Property created by this Judgment in favor of [Wiggins] in the amount of $660,000.00 found by the jury for the purchase, preservation and improvement of the property....

MR180; App'x B.

Under the circumstances, the judgment does not create a debt against Kelly or her interest in the property. The judicial lien, as described in the judgment, should be enforceable in rem and not against Kelly. *See id.* The lien represents money that Wiggins expended purchasing 701 Bay after a wrongful foreclosure and purportedly preserving/improving it. MR6, 48. The money never went into Kelly's hands, she never requested it, she has never owed it to Wiggins, and she was not its beneficiary. In essence, Wiggins is like a secured creditor in bankruptcy who, after the debtor is absolved of personal liability, is entitled to have the judgment lien paid when the property is sold. *Cf. Moser v. Schachar*, No. 4:14-CV-185, 2015 WL 679689, at \*1, 4-6 (E.D. Tex. Feb. 17, 2015). Unlike bankruptcy,

22

however, Kelly's property does not need to be sold to satisfy debt because she is not encumbered with any debt under the 2012 judgment.

This is not a situation where judgment collection rests on Kelly's whim. It is also not a situation where judgment collection will be forever delayed. In *Katz v. Bianchi*, the Fourteenth Court was concerned that the whim of a single party could prevent a judgment's viability. 848 S.W.2d 372, 375 (Tex. App.—Houston [14th Dist.] 1993, no writ). Here, while Kelly might ultimately decide when to sell, transfer, or otherwise convey 701 Bay, she does not control all the circumstances that may precipitate 701 Bay's eventual conveyance. Kelly cannot own the property forever. Wiggins will still have an opportunity to collect on the judgment.

Admittedly, the result seems harsh on Wiggins. But, if Wiggins wanted to complain about the judgment and the lien, he could have, and should have, complained after the trial court issued its final judgment. At this point, neither the trial court, nor the appellate courts have jurisdiction to change the nature of the lien and Wiggins' enforcement remedies. The Court should not let the trial court rewrite its judgment years after the trial court's plenary power expired. Further, forcing Kelly to make what amounts to a substantial lump sum payment for a purchase that she did not make or improvements that she did not request seems inequitable.

## III. Kelly Has No Adequate Remedy

Kelly does not need to show she lacks an adequate appellate remedy. Relators do not need to show they lack adequate remedies on appeal when trial courts exceed their jurisdiction and issue void orders. *In re Vaishangi*, 442 S.W.3d at 261. The trial court signed its final judgment in 2012. MR181; App'x. B. As demonstrated above, the trial court did not have jurisdiction to issue its 2014 foreclosure order and order of sale, which makes the order void. Further, the trial court has violated constitutional due-process and due-course-of-law provisions. Mandamus is, therefore, proper here.

Regardless, Kelly does not have any adequate remedies on appeal. Kelly had no appellate remedies besides seeking mandamus relief after the trial court issued its 2014 order. *See Kelly*, 2015 WL 2169519, at *3 (acknowledging that 2014 order was not a final judgment or an appealable interlocutory order); *see also Walter v. Marathon Oil Corp.*, 422 S.W.3d 848, 855 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (stating that post-judgment enforcement orders are not subject to appeal). Further, Kelly stands to permanently lose her constitutional homestead rights and her rights to due process/due course of law.

## PRAYER

For these reasons, Kelly respectfully requests that the Court grant mandamus and declare the trial court's 2014 foreclosure order and order for sale void.

24

Alternatively, Kelly requests that the Court vacate the foreclosure order and the order for sale. Kelly also requests any other relief to which she is entitled.

Respectfully submitted,

SMITH LAW GROUP LLLP

_/s/ Maitreya Tomlinson_
Maitreya Tomlinson
State Bar No. 24070751
maitreya@appealsplus.com
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, Texas 78746
(512) 439-3230
(512) 439-3232 (fax)

_Counsel for Relator_
_Amelia V. Kelly_

## RULE 52.3(j) CERTIFICATION

By my signature below, I certify that I have reviewed the foregoing petition and concluded that every factual statement in the petition is supported by competent evidence included in the mandamus record.

/s/ Maitreya Tomlinson
Maitreya Tomlinson

## RULE 9.4(I) CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Rule 9.4(i), if applicable, because it contains 4,402 words, excluding any parts exempted by Rule 9.4(i)(1).

/s/ Maitreya Tomlinson
Maitreya Tomlinson

**CERTIFICATE OF SERVICE**

On August 31, 2015, in compliance with Texas Rule of Appellate Procedure 9.5, I served a copy of this petition for writ of mandamus by e-service, e-mail, facsimile, or mail to:

George W. Vie, III
MILLS SHIRLEY, LLP
2228 Mechanics Street
Galveston, Texas 77550
gvie@millshirley.com
*Counsel for Real Party in Interest*

Timothy A. Beeton,
SIMPSON & BEETON
2200 Market Street, Suite 801
Galveston, Texas 77550
tbeeton@simpsonbeeton.com
*Courtesy Copy*

Hon. John Ellisor
122nd Judicial District Court
600 59th Street, Suite 4304
Galveston, Texas 77551
*Respondent*


*/s/ Maitreya Tomlinson*
Maitreya Tomlinson

# NO. _____

# In the Supreme Court of Texas

## *IN RE* **AMELIA V. KELLY,**

*Relator*

ORIGINAL PROCEEDING FROM CAUSE NO. 11CV0325
122ND DISTRICT COURT OF GALVESTON COUNTY, TEXAS
HON. JOHN ELLISOR PRESIDING

## APPENDIX TO RELATOR'S PETITION FOR WRIT OF MANDAMUS

Order of Judicial Foreclosure (signed June 23, 2014) ......................................Tab A

Final Judgment (signed June 22, 2012) ............................................................Tab B

Writ of Execution and Order of Sale (dated August 26, 2014) ........................Tab C

TEX. CONST. art. XVI, § 50.............................................................................Tab D

TEX. PROP. CODE § 41.001 ...............................................................................Tab E

TEX. PROP. CODE § 53.254.................................................................................Tab F

U.S. CONST. amend. XIV ..................................................................................Tab G

TEX. CONST. art. I, § 15....................................................................................Tab H

TEX. CONST. art. I, § 19....................................................................................Tab I

11-CV-0325
DCORDER
Order
882265

2014 JUN 23 PM 3:05

NO. 11CV0325

| | | |
|---|---|---|
| AMELIA V. KELLY | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | DISTRICT CLERK |
| V. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| MATTHEW D. WIGGINS, JR. | § | |
| and D. L. HAMMAKER | § | |
| *Defendants* | § | 122ND JUDICIAL DISTRICT |

## ORDER OF JUDICIAL FORECLOSURE

BE IT REMEMBERED that on the 25th day of March, 2014 and the 12th day of May, 2014, came on Defendant Matthew D. Wiggins, Jr.'s Motion to Enforce Final Judgment and for Order of Judicial Foreclosure and the Court, having considered the same, and arguments of counsel, is of the opinion that the Motion should be, and hereby is, GRANTED. It is, accordingly,

ORDERED that the lien in favor of Matthew D. Wiggins, Jr. set forth in the Court's Final Judgment of June 22, 2012, for the amount of $660,000 found by the jury to be for the purchase, preservation and improvement of the property should be and hereby is judicially foreclosed as to the subject property described as follows:

> A tract of land located in Galveston County, Texas, legally described as Lot Six (6), in Block Five (5), of the Town of Kemah, Formerly known as Evergreen, a subdivision in Galveston County, Texas, according to the map or plat thereof recorded in Volume 204, Page 258 and transferred to Volume 14, Page 62, of the Map of Records, both in the Office of the County Clerk of Galveston County, Texas.

It is further ORDERED that the District Clerk issue an order of sale to the Sheriff of Galveston County directing the Sheriff to conduct a Sheriff's sale of the subject property.

SIGNED this 23 day of ___June___, 2014.

_____
JUDGE PRESIDING

574

**TAB A**

Doryn Danner Glenn
CLERK DISTRICT COURT
FILED

JUN 2 2 2012

GALVESTON COUNTY TEXAS
BY
DEPUTY

CAUSE NO. 11CV0325

| | | |
|---|---|---|
| AMELIA V. KELLY, | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | |
| V. | § | 122nd JUDICIAL DISTRICT |
| | § | |
| MATTHEW D. WIGGINS, JR. and | § | |
| D.L. HAMMAKER, | § | |
| *Defendants* | § | GALVESTON COUNTY, TEXAS |

## FINAL JUDGMENT

BE IT REMEMBERED that on the 13th day of February, 2012, came on to be heard the above captioned cause; and Plaintiff, AMELIA V. KELLY appeared in person and through his attorneys and announced ready for trial; Defendants, MATTHEW D. WIGGINS, JR. and D. L. HAMMAKER, appeared in person and by their attorneys, and announced ready for trial; whereupon, a jury was impaneled and sworn, and it heard the evidence and arguments of counsel. In response to the jury charge, the jury made following findings that the Court received, filed and entered of record on February 17, 2012.

### QUESTION NO. 1

Did Amy Kelly and Matt Wiggins intend to bind themselves to an agreement that included the following terms:

a) Wiggins would provide not less than $400,000.00 to fund the purchase and renovation of the property; and

b) Kelly would be paid $5,000.00 per month to supervise the renovations; and

c) Wiggins and Kelly would share profits and losses from 701 Bay on the basis of 60% to Wiggins and 40% to Kelly with a mutual right of control of the business

Answer "Yes" or "No".

ANSWER:    NO

---

Final Judgment

11-CV-0325
DCJUFJV
Judgment – Final – Jury Verdict – OCA
425462

**Tab B**

430

## QUESTION NO. 8

What is a reasonable fee for the necessary services of Amy Kelly's attorneys, state in dollars and cents?

ANSWER:     $50,000.00

## QUESTION NO. 9

What is a reasonable fee for the necessary services of Matt Wiggins and Dale Hammaker's attorneys, state in dollars and cents?

ANSWER:     $50,000.00

To answer "Yes" to any part of the following questions, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

## QUESTION NO. 10

Do you find from clear and convincing evidence that Matt Wiggins committed fraud against Amy Kelly?

Fraud occurs when:

a.      The party makes a material misrepresentation, and

b.      The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

c.      The misrepresentation is made with the intention that it should be acted on by the other party, and

d.      The other party relies on the misrepresentation and thereby suffers injury.

Misrepresentation means:

a.      a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

"Clear and convincing evidence" means the measure or degree of proof that produces a

**Tab B**                                                                    431

firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No".

ANSWER:    NO


## QUESTION NO. 13

As of June 19, 2009, was it Amy Kelly's intent to reside at 701 Bay?

If you find that Amy Kelly owned no other real estate, intent may be implied by statements to other parties and by overt acts of preparation evidencing the intention.

Answer "Yes" or "No".

ANSWER:    YES


## QUESTION NO. 14

Did Matt Wiggins wrongfully convert the personal property of Amy Kelly?

Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights.

To establish a claim for conversion of personal property, a plaintiff must prove that:

(1)    the plaintiff owned or had legal possession of the property or entitlement to possession;

(2)    the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiffs rights as an owner;

(3)    the plaintiff demanded return of the property; and

(4)    the defendant refused to return the property.

Answer "Yes" or "No".

ANSWER:    NO

Final Judgment                                                                                       *3*

**Tab B**

<span style="color:red">432</span>

## QUESTION NO. 15

Did the negligence, if any, of Amy Kelly proximately cause loss of her personal property?

Answer "Yes" or "No".

ANSWER:    YES

## QUESTION NO. 17

What sum of money, if paid now in cash, would reimburse Matt Wiggins for all amounts spent by him to purchase, preserve, and improve the property?

Answer in dollars and cents, if any.

ANSWER:    $660,000.00

The Court considered the pleadings on file in this cause, the stipulations of the parties, and the findings of the jury, and being of the opinion that Plaintiff AMELIA V. KELLY is entitled to Judgment from and against the Defendant MATTHEW D. WIGGINS, JR. as follows:

It is **ORDERED, ADJUDGED,** and **DECREED**, that Plaintiff, AMELIA V. KELLY, recover Judgment from Defendant, MATTHEW D. WIGGINS, JR., and D. L. Hammaker declaring that the foreclosure conducted on January 5, 2010 is void and that title did not pass from Plaintiff AMELIA V. KELLY to Defendant MATTHEW D. WIGGINS, JR., and that all right, title and interest of MATTHEW D. WIGGINS, JR. in and to the property (hereafter referred to as the "Subject Property") described as follows:

> A tract of land located in Galveston County, Texas, legally described as Lot Six (6), in Block Five (5), of the Town of Kemah, Formerly known as Evergreen, a subdivision in Galveston County, Texas, according to the map or plat thereof recorded in Volume 204, Page 258 and transferred to Volume 14, Page 62, of the Map

of Records, both in the Office of the County Clerk of Galveston County, Texas (hereinafter the "Property")

remains vested in Plaintiff, AMELIA V. KELLY.

It is further **ORDERED, ADJUDGED AND DECREED** that the Subject Property is free and clear of any liens and claims of any party to this cause, subject only to (1) a lien against the Property created by this Judgment in favor of Defendant MATTHEW D. WIGGINS, JR. in the amount of $660,000.00 found by the jury for the purchase, preservation and improvement of the property,(2) any other liens of record that were otherwise valid and existing on January 5, 2010, which remain outstanding at the time of Judgment, and (3) the reimbursement rights of Defendant MATTHEW D. WIGGINS for property taxes that have been paid by MATTHEW D. WIGGINS since the verdict was delivered in this case on February 13, 2012, which were not included in the amount found by the jury for the purchase, preservation and improvement of the property.

It is further **ORDERED, ADJUDGED AND DECREED** that Plaintiff, AMELIA V. KELLY, shall have all such Writs and Orders as shall become, in Plaintiff's behalf, necessary to enforce the execution hereof, and to recover title and possession to the Subject Property and title in fee simple to the Property is hereby quieted in the name of Plaintiff AMELIA V. KELLY and Defendant MATTHEW D. WIGGINS is divested of all right, title and interest in the Property.

It is further **ORDERED, ADJUDGED AND DECREED** that Plaintiff AMELIA V. KELLY have and recover attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code §37.009, which the Court finds to be equitable and just, in the amount of $50,000.00 against Defendant MATTHEW D. WIGGINS, JR.

It is further **ORDERED, ADJUDGED AND DECREED** that Defendant MATTHEW D. WIGGINS, JR. have and recover attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code

**Tab B**                                                                                      434

§37.009, which the Court finds to be equitable and just, in the amount of $50,000.00 against Plaintiff AMELIA V. KELLY.

All relief not specifically granted herein is denied. This is a Final Judgment disposing of all issues and all parties, and is appealable.

SIGNED this 22 day of ___June, 2012___

_(signature)_

JUDGE PRESIDING

**APPROVED AS TO FORM ONLY:**

/s/ Larry A. Vick/
_____

LARRY A. VICK
Texas Bar No. 20563500
908 Town & Country Blvd., Suite 120
Houston, Texas 77024
(713) 333-6440
(713) 984-7682 [Fax]

LAW OFFICE OF TOM F. COLEMAN

/s/ Tom F. Coleman/
_____

Tom F. Coleman
State Bar No. 04572000
tfc@tfclaw.com
211 Norfolk, Suite 528
Houston, Texas 77098
(713) 523-2800
(713) 523-2804 – fax

ATTORNEYS FOR PLAINTIFF,
AMELIA V. KELLY

**Tab B**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded on this the 14th day of June, 2012, by U.S. Mail, hand delivery, electronic delivery and/or through facsimile to:

Timothy A. Beeton,
Simpson & Beeton
2200 Market Street, Suite 801
Galveston, Texas 77550
Attorneys for Defendants

/s/Larry A. Vick/

_____

Larry A. Vick

**Tab B**

436



# WRIT OF EXECUTION AND ORDER OF SALE

AMELIA V. KELLY VS. MATTHEW D. WIGGINS, JR., ET AL

Cause No.: 11-CV-0325
122nd District Court of Galveston County

### State of Texas

To any Sheriff or any Constable within the State of Texas, GREETING:

WHEREAS, on this the 22nd day of June, 2012, in the Honorable **122nd District Court** of Galveston County, Texas **AMELIA V. KELLY** recovered a judgment from **MATTHEW D. WIGGINS, JR. AND D.L. HAMMAKER** declaring that the foreclosure conducted on January 5, 2010 is void and that title did not pass from Plaintiff **AMELIA V. KELLY** to Defendant **MATTHEW D. WIGGINS, JR.**, and that all right, title and interest of **MATTHEW D. WIGGINS, JR** .in and to the property (hereafter referred to as the "Subject Property") described as follows:

**A tract of land located in Galveston County, Texas, legally described as Lot Six (6), in Block Five (5), of the Town of Kemah, Formerly known as Evergreen, a subdivision in Galveston County, Texas, according to the map or plat thereof recorded in Volume 204, Page 258 and transferred to Volume 14, Page 62, of the Map of Records, both in the Office of the County Clerk of Galveston County, Texas (hereinafter the "Property")**

Remains vested in Plaintiff, **AMELIA V. KELLY**.

**AMELIA V. KELLY** shall have and recover Attorney's fees which the Court finds to be equitable and just, in the amount of **$50,000.00** against Defendant **MATHEW D. WIGGINS, JR.**

It is further **ORDERED, ADJUDGED AND DECREED** that the Subject Property is free and clear of any liens and claims of any party to this cause, subject only to (I) a lien against the Property created by this Judgment in favor of Defendant **MATTHEW D. WIGGINS, JR.** in the amount of **$660,000.00** found by the jury for the purchase, preservation and improvement of the property, (2) any other liens of record that were otherwise valid and existing on January 5, 2010, which remain outstanding at the time of Judgment, and (3) the reimbursement rights of Defendant **MATTHEW D. WIGGINS** for property taxes that have been paid by **MATTHEW D. WIGGINS** since the verdict was delivered in this case on February, 13, 2012, which were not included in the amount found by the jury for the purchase, preservation and improvement of the property. **MATTHEW D. WIGGINS**, have and recover Attorney's fees which the Court finds to be equitable and just, in the amount of **$50,000.00** against **AMELIA V. KELLY; together** with an **ORDER OF JUDICIAL FORECLOSURE** as signed and entered **on the 23rd day of June, 2014**, in the Honorable **122nd District Court** of Galveston County, Texas in favor of **MATTHEW D. WIGGINS, JR.**, it is **ORDERED** that the lien in favor of **MATTHEW D. WIGGINS, JR.** set forth in the Court's Final Judgment of June 22, 2012, for the amount of **$660,000** found by the jury to be for the purchase, preservation and improvement of the property should be and hereby is judicially foreclosed as to the June 23,2014 Order subject property described as follows:

**A tract of land located in Galveston County, Texas, legally described as Lot Six (6), in Block Five (5), of the Town of Kemah, Formerly known as Evergreen, a subdivision in Galveston County, Texas, according to the map or plat thereof recorded in Volume 204, Page 258 and transferred to Volume 14, Page 62, of the Map of Records, both in the Office of the County Clerk of Galveston County, Texas.**

in addition to the costs expended in that behalf;

**Tab C**

11 - CV - 0325
DCWREOSI
Writ of Execution and Order of Sale — Issuani
913971

**AND WHEREAS,** said lien existed on the June 22, 2012 and it is ordered and decreed by said judgment and order signed June 23, 2014 that said property be sold as under execution in satisfaction of said judgment, and if said property shall sell for more than sufficient to pay off and satisfy said sums of money, the excess should be paid over to the said, AMELIA V. KELLY. But if said property should not sell for enough to pay off said sums of money, the balance due shall be made as under execution.

**NOW THEREFORE, YOU ARE HEREBY COMMANDED,** to proceed according to law and seize and sale the above described property as under execution, and apply the proceeds thereof to the payment and satisfaction of the aforesaid judgment in the sums or sums with interest as shown above all cost of said suit as itemized in the attached cost statement, excluding costs due the county.

**TO SERVING OFFICER:**

**HERIN FAIL NOT,** return this Order of Sale with your return thereon, on or before 90 days from the date of issuance of this Order of Sale, to the District clerk of Galveston County, Texas. **FIRST,** retain your costs and fees for holding said sale. **SECOND,** remit the court costs to the District Clerk of Galveston County. **THIRD,** remit the payment of remaining monies received to the proper parties as shown in the Judgment, all in accordance with the statutes of the State of Texas.

GIVEN under my hand and seal of office, at Galveston, Texas, this on this the 26th day of August, 2014.

Issued at the request of:  
Timothy A. Beeton, Attorney  
2200 Market St.  
Ste. 801  
Galveston, TX 77550

**John D. Kinard, District Clerk**

**Galveston County, Texas**

By: _____

Valerie Millican, Deputy

**Tab C**

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article XVI. General Provisions

Vernon's Ann.Texas Const. Art. 16, § 50

§ 50. Homestead; protection from forced sale; mortgages, trust deeds and liens

Effective: November 22, 2013
Currentness

(a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:

(1) the purchase money thereof, or a part of such purchase money;

(2) the taxes due thereon;

(3) an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding;

(4) the refinance of a lien against a homestead, including a federal tax lien resulting from the tax debt of both spouses, if the homestead is a family homestead, or from the tax debt of the owner;

(5) work and material used in constructing new improvements thereon, if contracted for in writing, or work and material used to repair or renovate existing improvements thereon if:

(A) the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead;

(B) the contract for the work and material is not executed by the owner or the owner's spouse before the fifth day after the owner makes written application for any extension of credit for the work and material, unless the work and material are necessary to complete immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing;

(C) the contract for the work and material expressly provides that the owner may rescind the contract without penalty or charge within three days after the execution of the contract by all parties, unless the work and material are necessary to complete immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing; and

**Tab D**

(D) the contract for the work and material is executed by the owner and the owner's spouse only at the office of a third-party lender making an extension of credit for the work and material, an attorney at law, or a title company;

(6) an extension of credit that:

(A) is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse;

(B) is of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made;

(C) is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud;

(D) is secured by a lien that may be foreclosed upon only by a court order;

(E) does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit;

(F) is not a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit;

(G) is payable in advance without penalty or other charge;

(H) is not secured by any additional real or personal property other than the homestead;

(I) is not secured by homestead property that on the date of closing is designated for agricultural use as provided by statutes governing property tax, unless such homestead property is used primarily for the production of milk;

(J) may not be accelerated because of a decrease in the market value of the homestead or because of the owner's default under other indebtedness not secured by a prior valid encumbrance against the homestead;

(K) is the only debt secured by the homestead at the time the extension of credit is made unless the other debt was made for a purpose described by Subsections (a)(1)-(a)(5) or Subsection (a)(8) of this section;

(L) is scheduled to be repaid:

**Tab D**

(i) in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment; or

(ii) if the extension of credit is a home equity line of credit, in periodic payments described under Subsection (t)(8) of this section;

(M) is closed not before:

(i) the 12th day after the later of the date that the owner of the homestead submits a loan application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section;

(ii) one business day after the date that the owner of the homestead receives a copy of the loan application if not previously provided and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing. If a bona fide emergency or another good cause exists and the lender obtains the written consent of the owner, the lender may provide the documentation to the owner or the lender may modify previously provided documentation on the date of closing; and

(iii) the first anniversary of the closing date of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property, except a refinance described by Paragraph (Q)(x)(f) of this subdivision, unless the owner on oath requests an earlier closing due to a state of emergency that:

(a) has been declared by the president of the United States or the governor as provided by law; and

(b) applies to the area where the homestead is located;

(N) is closed only at the office of the lender, an attorney at law, or a title company;

(O) permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute;

(P) is made by one of the following that has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area:

(i) a bank, savings and loan association, savings bank, or credit union doing business under the laws of this state or the United States;

(ii) a federally chartered lending instrumentality or a person approved as a mortgagee by the United States government to make federally insured loans;

(iii) a person licensed to make regulated loans, as provided by statute of this state;

**Tab D**

(iv) a person who sold the homestead property to the current owner and who provided all or part of the financing for the purchase;

(v) a person who is related to the homestead property owner within the second degree of affinity or consanguinity; or

(vi) a person regulated by this state as a mortgage broker; and

(Q) is made on the condition that:

(i) the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender;

(ii) the owner of the homestead not assign wages as security for the extension of credit;

(iii) the owner of the homestead not sign any instrument in which blanks relating to substantive terms of agreement are left to be filled in;

(iv) the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding;

(v) at the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit;

(vi) the security instruments securing the extension of credit contain a disclosure that the extension of credit is the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(vii) within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit;

(viii) the owner of the homestead and any spouse of the owner may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge;

(ix) the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead property on the date the extension of credit is made;

(x) except as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's

**Tab D**

obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:

(a) paying to the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b) sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c) sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d) delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f) if the failure to comply cannot be cured under Subparagraphs (x)(a) -(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section; and

(xi) the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the extension of credit is made by a person other than a person described under Paragraph (P) of this subdivision or if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents;

(7) a reverse mortgage; or

(8) the conversion and refinance of a personal property lien secured by a manufactured home to a lien on real property, including the refinance of the purchase price of the manufactured home, the cost of installing the manufactured home on the real property, and the refinance of the purchase price of the real property.

(b) An owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law.

**Tab D**

(c) No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section, whether such mortgage, trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasance shall be void.

(d) A purchaser or lender for value without actual knowledge may conclusively rely on an affidavit that designates other property as the homestead of the affiant and that states that the property to be conveyed or encumbered is not the homestead of the affiant.

(e) A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1)-(a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless:

(1) the refinance of the debt is an extension of credit described by Subsection (a)(6) of this section; or

(2) the advance of all the additional funds is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

(f) A refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of this section, may not be secured by a valid lien against the homestead unless the refinance of the debt is an extension of credit described by Subsection (a)(6) or (a)(7) of this section.

(g) An extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument:

"NOTICE CONCERNING EXTENSIONS OF CREDIT DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION:

"SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION ALLOWS CERTAIN LOANS TO BE SECURED AGAINST THE EQUITY IN YOUR HOME. SUCH LOANS ARE COMMONLY KNOWN AS EQUITY LOANS. IF YOU DO NOT REPAY THE LOAN OR IF YOU FAIL TO MEET THE TERMS OF THE LOAN, THE LENDER MAY FORECLOSE AND SELL YOUR HOME. THE CONSTITUTION PROVIDES THAT:

"(A) THE LOAN MUST BE VOLUNTARILY CREATED WITH THE CONSENT OF EACH OWNER OF YOUR HOME AND EACH OWNER'S SPOUSE;

"(B) THE PRINCIPAL LOAN AMOUNT AT THE TIME THE LOAN IS MADE MUST NOT EXCEED AN AMOUNT THAT, WHEN ADDED TO THE PRINCIPAL BALANCES OF ALL OTHER LIENS AGAINST YOUR HOME, IS MORE THAN 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME;

"(C) THE LOAN MUST BE WITHOUT RECOURSE FOR PERSONAL LIABILITY AGAINST YOU AND YOUR SPOUSE UNLESS YOU OR YOUR SPOUSE OBTAINED THIS EXTENSION OF CREDIT BY ACTUAL FRAUD;

"(D) THE LIEN SECURING THE LOAN MAY BE FORECLOSED UPON ONLY WITH A COURT ORDER;

"(E) FEES AND CHARGES TO MAKE THE LOAN MAY NOT EXCEED 3 PERCENT OF THE LOAN AMOUNT;

**Tab D**

"(F) THE LOAN MAY NOT BE AN OPEN-END ACCOUNT THAT MAY BE DEBITED FROM TIME TO TIME OR UNDER WHICH CREDIT MAY BE EXTENDED FROM TIME TO TIME UNLESS IT IS A HOME EQUITY LINE OF CREDIT;

"(G) YOU MAY PREPAY THE LOAN WITHOUT PENALTY OR CHARGE;

"(H) NO ADDITIONAL COLLATERAL MAY BE SECURITY FOR THE LOAN;

"(I) THE LOAN MAY NOT BE SECURED BY HOMESTEAD PROPERTY THAT IS DESIGNATED FOR AGRICULTURAL USE AS OF THE DATE OF CLOSING, UNLESS THE AGRICULTURAL HOMESTEAD PROPERTY IS USED PRIMARILY FOR THE PRODUCTION OF MILK;

"(J) YOU ARE NOT REQUIRED TO REPAY THE LOAN EARLIER THAN AGREED SOLELY BECAUSE THE FAIR MARKET VALUE OF YOUR HOME DECREASES OR BECAUSE YOU DEFAULT ON ANOTHER LOAN THAT IS NOT SECURED BY YOUR HOME;

"(K) ONLY ONE LOAN DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MAY BE SECURED WITH YOUR HOME AT ANY GIVEN TIME;

"(L) THE LOAN MUST BE SCHEDULED TO BE REPAID IN PAYMENTS THAT EQUAL OR EXCEED THE AMOUNT OF ACCRUED INTEREST FOR EACH PAYMENT PERIOD;

"(M) THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A LOAN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER; AND MAY NOT WITHOUT YOUR CONSENT CLOSE BEFORE ONE BUSINESS DAY AFTER THE DATE ON WHICH YOU RECEIVE A COPY OF YOUR LOAN APPLICATION IF NOT PREVIOUSLY PROVIDED AND A FINAL ITEMIZED DISCLOSURE OF THE ACTUAL FEES, POINTS, INTEREST, COSTS, AND CHARGES THAT WILL BE CHARGED AT CLOSING; AND IF YOUR HOME WAS SECURITY FOR THE SAME TYPE OF LOAN WITHIN THE PAST YEAR, A NEW LOAN SECURED BY THE SAME PROPERTY MAY NOT CLOSE BEFORE ONE YEAR HAS PASSED FROM THE CLOSING DATE OF THE OTHER LOAN, UNLESS ON OATH YOU REQUEST AN EARLIER CLOSING DUE TO A DECLARED STATE OF EMERGENCY;

"(N) THE LOAN MAY CLOSE ONLY AT THE OFFICE OF THE LENDER, TITLE COMPANY, OR AN ATTORNEY AT LAW;

"(O) THE LENDER MAY CHARGE ANY FIXED OR VARIABLE RATE OF INTEREST AUTHORIZED BY STATUTE;

"(P) ONLY A LAWFULLY AUTHORIZED LENDER MAY MAKE LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(Q) LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MUST:

"(1) NOT REQUIRE YOU TO APPLY THE PROCEEDS TO ANOTHER DEBT EXCEPT A DEBT THAT IS SECURED BY YOUR HOME OR OWED TO ANOTHER LENDER;

"(2) NOT REQUIRE THAT YOU ASSIGN WAGES AS SECURITY;

**Tab D**

"(3) NOT REQUIRE THAT YOU EXECUTE INSTRUMENTS WHICH HAVE BLANKS FOR SUBSTANTIVE TERMS OF AGREEMENT LEFT TO BE FILLED IN;

"(4) NOT REQUIRE THAT YOU SIGN A CONFESSION OF JUDGMENT OR POWER OF ATTORNEY TO ANOTHER PERSON TO CONFESS JUDGMENT OR APPEAR IN A LEGAL PROCEEDING ON YOUR BEHALF;

"(5) PROVIDE THAT YOU RECEIVE A COPY OF YOUR FINAL LOAN APPLICATION AND ALL EXECUTED DOCUMENTS YOU SIGN AT CLOSING;

"(6) PROVIDE THAT THE SECURITY INSTRUMENTS CONTAIN A DISCLOSURE THAT THIS LOAN IS A LOAN DEFINED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(7) PROVIDE THAT WHEN THE LOAN IS PAID IN FULL, THE LENDER WILL SIGN AND GIVE YOU A RELEASE OF LIEN OR AN ASSIGNMENT OF THE LIEN, WHICHEVER IS APPROPRIATE;

"(8) PROVIDE THAT YOU MAY, WITHIN 3 DAYS AFTER CLOSING, RESCIND THE LOAN WITHOUT PENALTY OR CHARGE;

"(9) PROVIDE THAT YOU AND THE LENDER ACKNOWLEDGE THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LOAN CLOSES; AND

"(10) PROVIDE THAT THE LENDER WILL FORFEIT ALL PRINCIPAL AND INTEREST IF THE LENDER FAILS TO COMPLY WITH THE LENDER'S OBLIGATIONS UNLESS THE LENDER CURES THE FAILURE TO COMPLY AS PROVIDED BY SECTION 50(a)(6)(Q)(x), ARTICLE XVI, OF THE TEXAS CONSTITUTION; AND

"(R) IF THE LOAN IS A HOME EQUITY LINE OF CREDIT:

"(1) YOU MAY REQUEST ADVANCES, REPAY MONEY, AND REBORROW MONEY UNDER THE LINE OF CREDIT;

"(2) EACH ADVANCE UNDER THE LINE OF CREDIT MUST BE IN AN AMOUNT OF AT LEAST $4,000;

"(3) YOU MAY NOT USE A CREDIT CARD, DEBIT CARD, OR SIMILAR DEVICE, OR PREPRINTED CHECK THAT YOU DID NOT SOLICIT, TO OBTAIN ADVANCES UNDER THE LINE OF CREDIT;

"(4) ANY FEES THE LENDER CHARGES MAY BE CHARGED AND COLLECTED ONLY AT THE TIME THE LINE OF CREDIT IS ESTABLISHED AND THE LENDER MAY NOT CHARGE A FEE IN CONNECTION WITH ANY ADVANCE;

"(5) THE MAXIMUM PRINCIPAL AMOUNT THAT MAY BE EXTENDED, WHEN ADDED TO ALL OTHER DEBTS SECURED BY YOUR HOME, MAY NOT EXCEED 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LINE OF CREDIT IS ESTABLISHED;

"(6) IF THE PRINCIPAL BALANCE UNDER THE LINE OF CREDIT AT ANY TIME EXCEEDS 50 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME, AS DETERMINED ON THE DATE THE LINE OF CREDIT IS ESTABLISHED, YOU MAY NOT CONTINUE TO REQUEST ADVANCES UNDER THE LINE OF CREDIT UNTIL THE BALANCE IS LESS THAN 50 PERCENT OF THE FAIR MARKET VALUE; AND

"(7) THE LENDER MAY NOT UNILATERALLY AMEND THE TERMS OF THE LINE OF CREDIT.

**Tab D**

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE."

If the discussions with the borrower are conducted primarily in a language other than English, the lender shall, before closing, provide an additional copy of the notice translated into the written language in which the discussions were conducted.

(h) A lender or assignee for value may conclusively rely on the written acknowledgment as to the fair market value of the homestead property made in accordance with Subsection (a)(6)(Q)(ix) of this section if:

(1) the value acknowledged to is the value estimate in an appraisal or evaluation prepared in accordance with a state or federal requirement applicable to an extension of credit under Subsection (a)(6); and

(2) the lender or assignee does not have actual knowledge at the time of the payment of value or advance of funds by the lender or assignee that the fair market value stated in the written acknowledgment was incorrect.

(i) This subsection shall not affect or impair any right of the borrower to recover damages from the lender or assignee under applicable law for wrongful foreclosure. A purchaser for value without actual knowledge may conclusively presume that a lien securing an extension of credit described by Subsection (a)(6) of this section was a valid lien securing the extension of credit with homestead property if:

(1) the security instruments securing the extension of credit contain a disclosure that the extension of credit secured by the lien was the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(2) the purchaser acquires the title to the property pursuant to or after the foreclosure of the voluntary lien; and

(3) the purchaser is not the lender or assignee under the extension of credit.

(j) Subsection (a)(6) and Subsections (e)-(i) of this section are not severable, and none of those provisions would have been enacted without the others. If any of those provisions are held to be preempted by the laws of the United States, all of those provisions are invalid. This subsection shall not apply to any lien or extension of credit made after January 1, 1998, and before the date any provision under Subsection (a)(6) or Subsections (e)-(i) is held to be preempted.

(k) "Reverse mortgage" means an extension of credit:

(1) that is secured by a voluntary lien on homestead property created by a written agreement with the consent of each owner and each owner's spouse;

(2) that is made to a person who is or whose spouse is 62 years or older;

(3) that is made without recourse for personal liability against each owner and the spouse of each owner;

**Tab D**

(4) under which advances are provided to a borrower:

(A) based on the equity in a borrower's homestead; or

(B) for the purchase of homestead property that the borrower will occupy as a principal residence;

(5) that does not permit the lender to reduce the amount or number of advances because of an adjustment in the interest rate if periodic advances are to be made;

(6) that requires no payment of principal or interest until:

(A) all borrowers have died;

(B) the homestead property securing the loan is sold or otherwise transferred;

(C) all borrowers cease occupying the homestead property for a period of longer than 12 consecutive months without prior written approval from the lender;

(C-1) if the extension of credit is used for the purchase of homestead property, the borrower fails to timely occupy the homestead property as the borrower's principal residence within a specified period after the date the extension of credit is made that is stipulated in the written agreement creating the lien on the property; or

(D) the borrower:

(i) defaults on an obligation specified in the loan documents to repair and maintain, pay taxes and assessments on, or insure the homestead property;

(ii) commits actual fraud in connection with the loan; or

(iii) fails to maintain the priority of the lender's lien on the homestead property, after the lender gives notice to the borrower, by promptly discharging any lien that has priority or may obtain priority over the lender's lien within 10 days after the date the borrower receives the notice, unless the borrower:

(a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to the lender;

(b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings so as to prevent the enforcement of the lien or forfeiture of any part of the homestead property; or

**Tab D**

(c) secures from the holder of the lien an agreement satisfactory to the lender subordinating the lien to all amounts secured by the lender's lien on the homestead property;

(7) that provides that if the lender fails to make loan advances as required in the loan documents and if the lender fails to cure the default as required in the loan documents after notice from the borrower, the lender forfeits all principal and interest of the reverse mortgage, provided, however, that this subdivision does not apply when a governmental agency or instrumentality takes an assignment of the loan in order to cure the default;

(8) that is not made unless the prospective borrower and the spouse of the prospective borrower attest in writing that the prospective borrower and the prospective borrower's spouse received counseling regarding the advisability and availability of reverse mortgages and other financial alternatives that was completed not earlier than the 180th day nor later than the 5th day before the date the extension of credit is closed;

(9) that is not closed before the 12th day after the date the lender provides to the prospective borrower the following written notice on a separate instrument, which the lender or originator and the borrower must sign for the notice to take effect:

"IMPORTANT NOTICE TO BORROWERS RELATED TO YOUR REVERSE MORTGAGE

"UNDER THE TEXAS TAX CODE, CERTAIN ELDERLY PERSONS MAY DEFER THE COLLECTION OF PROPERTY TAXES ON THEIR RESIDENCE HOMESTEAD. BY RECEIVING THIS REVERSE MORTGAGE YOU MAY BE REQUIRED TO FORGO ANY PREVIOUSLY APPROVED DEFERRAL OF PROPERTY TAX COLLECTION AND YOU MAYBE REQUIRED TO PAY PROPERTY TAXES ON AN ANNUAL BASIS ON THIS PROPERTY.

"THE LENDER MAY FORECLOSE THE REVERSE MORTGAGE AND YOU MAY LOSE YOUR HOME IF:

"(A) YOU DO NOT PAY THE TAXES OR OTHER ASSESSMENTS ON THE HOME EVEN IF YOU ARE ELIGIBLE TO DEFER PAYMENT OF PROPERTY TAXES;

"(B) YOU DO NOT MAINTAIN AND PAY FOR PROPERTY INSURANCE ON THE HOME AS REQUIRED BY THE LOAN DOCUMENTS;

"(C) YOU FAIL TO MAINTAIN THE HOME IN A STATE OF GOOD CONDITION AND REPAIR;

"(D) YOU CEASE OCCUPYING THE HOME FOR A PERIOD LONGER THAN 12 CONSECUTIVE MONTHS WITHOUT THE PRIOR WRITTEN APPROVAL FROM THE LENDER OR, IF THE EXTENSION OF CREDIT IS USED FOR THE PURCHASE OF THE HOME, YOU FAIL TO TIMELY OCCUPY THE HOME AS YOUR PRINCIPAL RESIDENCE WITHIN A PERIOD OF TIME AFTER THE EXTENSION OF CREDIT IS MADE THAT IS STIPULATED IN THE WRITTEN AGREEMENT CREATING THE LIEN ON THE HOME;

"(E) YOU SELL THE HOME OR OTHERWISE TRANSFER THE HOME WITHOUT PAYING OFF THE LOAN;

"(F) ALL BORROWERS HAVE DIED AND THE LOAN IS NOT REPAID;

"(G) YOU COMMIT ACTUAL FRAUD IN CONNECTION WITH THE LOAN; OR

**Tab D**

"(H) YOU FAIL TO MAINTAIN THE PRIORITY OF THE LENDER'S LIEN ON THE HOME, AFTER THE LENDER GIVES NOTICE TO YOU, BY PROMPTLY DISCHARGING ANY LIEN THAT HAS PRIORITY OR MAY OBTAIN PRIORITY OVER THE LENDER'S LIEN WITHIN 10 DAYS AFTER THE DATE YOU RECEIVE THE NOTICE, UNLESS YOU:

"(1) AGREE IN WRITING TO THE PAYMENT OF THE OBLIGATION SECURED BY THE LIEN IN A MANNER ACCEPTABLE TO THE LENDER;

"(2) CONTEST IN GOOD FAITH THE LIEN BY, OR DEFEND AGAINST ENFORCEMENT OF THE LIEN IN, LEGAL PROCEEDINGS SO AS TO PREVENT THE ENFORCEMENT OF THE LIEN OR FORFEITURE OF ANY PART OF THE HOME; OR

"(3) SECURE FROM THE HOLDER OF THE LIEN AN AGREEMENT SATISFACTORY TO THE LENDER SUBORDINATING THE LIEN TO ALL AMOUNTS SECURED BY THE LENDER'S LIEN ON THE HOME.

"IF A GROUND FOR FORECLOSURE EXISTS, THE LENDER MAY NOT COMMENCE FORECLOSURE UNTIL THE LENDER GIVES YOU WRITTEN NOTICE BY MAIL THAT A GROUND FOR FORECLOSURE EXISTS AND GIVES YOU AN OPPORTUNITY TO REMEDY THE CONDITION CREATING THE GROUND FOR FORECLOSURE OR TO PAY THE REVERSE MORTGAGE DEBT WITHIN THE TIME PERMITTED BY SECTION 50(k)(10), ARTICLE XVI, OF THE TEXAS CONSTITUTION.THE LENDER MUST OBTAIN A COURT ORDER FOR FORECLOSURE EXCEPT THAT A COURT ORDER IS NOT REQUIRED IF THE FORECLOSURE OCCURS BECAUSE:

"(1) ALL BORROWERS HAVE DIED; OR

"(2) THE HOMESTEAD PROPERTY SECURING THE LOAN IS SOLD OR OTHERWISE TRANSFERRED."

"YOU SHOULD CONSULT WITH YOUR HOME COUNSELOR OR AN ATTORNEY IF YOU HAVE ANY CONCERNS ABOUT THESE OBLIGATIONS BEFORE YOU CLOSE YOUR REVERSE MORTGAGE LOAN. TO LOCATE AN ATTORNEY IN YOUR AREA, YOU MAY WISH TO CONTACT THE STATE BAR OF TEXAS."

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED IN PART BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE.";

(10) that does not permit the lender to commence foreclosure until the lender gives notice to the borrower, in the manner provided for a notice by mail related to the foreclosure of liens under Subsection (a)(6) of this section, that a ground for foreclosure exists and gives the borrower at least 30 days, or at least 20 days in the event of a default under Subdivision (6)(D)(iii) of this subsection, to:

(A) remedy the condition creating the ground for foreclosure;

(B) pay the debt secured by the homestead property from proceeds of the sale of the homestead property by the borrower or from any other sources; or

(C) convey the homestead property to the lender by a deed in lieu of foreclosure; and

**Tab  D**

(11) that is secured by a lien that may be foreclosed upon only by a court order, if the foreclosure is for a ground other than a ground stated by Subdivision (6)(A) or (B) of this subsection.

(l) Advances made under a reverse mortgage and interest on those advances have priority over a lien filed for record in the real property records in the county where the homestead property is located after the reverse mortgage is filed for record in the real property records of that county.

(m) A reverse mortgage may provide for an interest rate that is fixed or adjustable and may also provide for interest that is contingent on appreciation in the fair market value of the homestead property. Although payment of principal or interest shall not be required under a reverse mortgage until the entire loan becomes due and payable, interest may accrue and be compounded during the term of the loan as provided by the reverse mortgage loan agreement.

(n) A reverse mortgage that is secured by a valid lien against homestead property may be made or acquired without regard to the following provisions of any other law of this state:

(1) a limitation on the purpose and use of future advances or other mortgage proceeds;

(2) a limitation on future advances to a term of years or a limitation on the term of open-end account advances;

(3) a limitation on the term during which future advances take priority over intervening advances;

(4) a requirement that a maximum loan amount be stated in the reverse mortgage loan documents;

(5) a prohibition on balloon payments;

(6) a prohibition on compound interest and interest on interest;

(7) a prohibition on contracting for, charging, or receiving any rate of interest authorized by any law of this state authorizing a lender to contract for a rate of interest; and

(8) a requirement that a percentage of the reverse mortgage proceeds be advanced before the assignment of the reverse mortgage.

(o) For the purposes of determining eligibility under any statute relating to payments, allowances, benefits, or services provided on a means-tested basis by this state, including supplemental security income, low-income energy assistance, property tax relief, medical assistance, and general assistance:

(1) reverse mortgage loan advances made to a borrower are considered proceeds from a loan and not income; and

**Tab D**

(2) undisbursed funds under a reverse mortgage loan are considered equity in a borrower's home and not proceeds from a loan.

(p) The advances made on a reverse mortgage loan under which more than one advance is made must be made according to the terms established by the loan documents by one or more of the following methods:

(1) an initial advance at any time and future advances at regular intervals;

(2) an initial advance at any time and future advances at regular intervals in which the amounts advanced may be reduced, for one or more advances, at the request of the borrower;

(3) an initial advance at any time and future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached;

(4) an initial advance at any time, future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached, and subsequent advances at times and in amounts requested by the borrower according to the terms established by the loan documents to the extent that the outstanding balance is repaid; or

(5) at any time by the lender, on behalf of the borrower, if the borrower fails to timely pay any of the following that the borrower is obligated to pay under the loan documents to the extent necessary to protect the lender's interest in or the value of the homestead property:

(A) taxes;

(B) insurance;

(C) costs of repairs or maintenance performed by a person or company that is not an employee of the lender or a person or company that directly or indirectly controls, is controlled by, or is under common control with the lender;

(D) assessments levied against the homestead property; and

(E) any lien that has, or may obtain, priority over the lender's lien as it is established in the loan documents.

(q) To the extent that any statutes of this state, including without limitation, Section 41.001 of the Texas Property Code, purport to limit encumbrances that may properly be fixed on homestead property in a manner that does not permit encumbrances for extensions of credit described in Subsection (a)(6) or (a)(7) of this section, the same shall be superseded to the extent that such encumbrances shall be permitted to be fixed upon homestead property in the manner provided for by this amendment.

(r) The supreme court shall promulgate rules of civil procedure for expedited foreclosure proceedings related to the foreclosure of liens under Subsection (a)(6) of this section and to foreclosure of a reverse mortgage lien that requires a court order.

**Tab D**

(s) The Finance Commission of Texas shall appoint a director to conduct research on the availability, quality, and prices of financial services and research the practices of business entities in the state that provide financial services under this section. The director shall collect information and produce reports on lending activity of those making loans under this section. The director shall report his or her findings to the legislature not later than December 1 of each year.

(t) A home equity line of credit is a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which:

(1) the owner requests advances, repays money, and reborrows money;

(2) any single debit or advance is not less than $4,000;

(3) the owner does not use a credit card, debit card, or similar device, or preprinted check unsolicited by the borrower, to obtain an advance;

(4) any fees described by Subsection (a)(6)(E) of this section are charged and collected only at the time the extension of credit is established and no fee is charged or collected in connection with any debit or advance;

(5) the maximum principal amount that may be extended under the account, when added to the aggregate total of the outstanding principal balances of all indebtedness secured by the homestead on the date the extension of credit is established, does not exceed an amount described under Subsection (a)(6)(B) of this section;

(6) no additional debits or advances are made if the total principal amount outstanding exceeds an amount equal to 50 percent of the fair market value of the homestead as determined on the date the account is established;

(7) the lender or holder may not unilaterally amend the extension of credit; and

(8) repayment is to be made in regular periodic installments, not more often than every 14 days and not less often than monthly, beginning not later than two months from the date the extension of credit is established, and:

(A) during the period during which the owner may request advances, each installment equals or exceeds the amount of accrued interest; and

(B) after the period during which the owner may request advances, installments are substantially equal.

(u) The legislature may by statute delegate one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is:

**Tab D**

(1) in effect at the time of the act or omission; and

(2) made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.

(v) A reverse mortgage must provide that:

(1) the owner does not use a credit card, debit card, preprinted solicitation check, or similar device to obtain an advance;

(2) after the time the extension of credit is established, no transaction fee is charged or collected solely in connection with any debit or advance; and

(3) the lender or holder may not unilaterally amend the extension of credit.

**Credits**

Amended Nov. 6, 1973; Nov. 7, 1995; Nov. 4, 1997, eff. Jan. 1, 1998; Nov. 2, 1999; Nov. 6, 2001, eff. Nov. 26, 2001; Sept. 13, 2003, eff. Sept. 29, 2003; Nov. 8, 2005, eff. Nov. 23, 2005; Nov. 6, 2007, eff. Dec. 4, 2007; Nov. 5, 2013, eff. Nov. 22, 2013.

**Editors' Notes**

### INTERPRETIVE COMMENTARY

### 1993 Main Volume

The homestead exemption was a Texas creation. It was the logical development of the evolution of the changing social attitude toward debtors whereby first the person, then the personal property, and finally the real estate of the debtor were freed from the control of the creditor through the abolition of imprisonment for debt, the extension of chattel exemptions, and the adoption of the homestead exemption.

While Texas was governed by Spanish colonial law and, subsequent thereto, the law of Mexico, it became familiarized with chattel exemptions for such items as family clothing, the minimum of furniture for the family abode, and the implements of the breadwinner, none of which could be used for forced application to the payment of debts. In an agricultural community, it was no great step to extend the concept underlying these chattel exemptions to the family home and land.

The earliest homestead exemption law was the Statute of January 26, 1839 (Laws of the Republic of Texas, First Session of the Third Congress, 1839, pp. 125-126). Beyond statements to its intent and purpose, the idea of homestead exemption elicited slight notice, scarcely any comment, and no discernible opposition. Its passage was hurried through the legislature on the last day of its session with the legislators apparently unaware of the important precedent the law would establish or of the far-reaching effect it was to have.

The direct cause of the law was the United States Panic of 1837 and the ensuing depression during which numerous families lost homes and farms through foreclosures, and in the Republic of Texas business became stagnate, money scarce, and credit unobtainable. Most Texans were in debt, and the young nation was in economic peril. The homestead

**Tab  D**

exemption was looked upon as a necessary measure to offset the economic danger to Texans and Texas. It had a three-fold purpose: (1) to preserve the integrity of the family as the basic element of social organization, and, incidentally, to encourage colonization for in a frontier society each pioneer family was of definite value to the community; (2) to provide the debtor with a home for his family and some means to support them and to recoup his economic losses so as to prevent the family from becoming a burdensome charge upon the public; (3) to retain in pioneers the feeling of freedom and sense of independence which was deemed necessary to the continued existence of democratic institutions.

Although the Constitution of the Republic contained no provisions with reference to homestead exemptions, Texans quickly learned that homestead exemptions could not be left to the mercy of the legislators. The Fourth Congress of the Republic, in an act concerning executions (Act of February 5, 1840, sections 4 and 24, Laws of Republic of Texas, Session of Fourth Congress, pp. 93-98), annulled the law of 1839, although no explanation for this action can be found in the journals of that congress. The next legislature, however, repealed the action of the Fourth Congress and re-enacted the original homestead exemption law. (Act of December 22, 1840, Laws of Republic of Texas, Session of Fifth Congress, pp. 61-62). Consequently, the convention which drew up the Constitution of 1845, designed to provide for the government of the State of Texas after annexation by the United States, determined to safeguard the homestead by putting it beyond the reach of legislators as well as creditors by incorporating an exemption provision in the constitution.

Article VII, Section 22, of the Constitution of 1845 declared:

> The Legislature shall have power to protect by law from forced sale, a certain portion of the property of all heads of families. The homestead of a family not to exceed two hundred acres of land, (not included in a town or city,) or any town or city lot or lots, in value not to exceed two thousand dollars, shall not be subject to forced sale, for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by consent of the wife, in such manner as the Legislature may hereafter point out.

There was little opposition in the convention to the homestead exemption as such, although it was adopted by a vote of only 42 to 14. The opposition specifically went on record as approving of the principle but objected to the wording of the measure on various grounds--the limitation on the size of the homestead was felt to be too small or too large; or objection was voiced to the provision preventing the husband from alienating the homestead without the wife's consent.

The Constitutions of 1861 and 1866 carried forward those homestead provisions. The Constitution of 1869 provided for the exemption of a rural homestead not exceeding 200 acres or an urban homestead not in excess of $5,000 evaluation without reference to improvements. The present constitution included the 1869 provisions with the added provision that a place of business might be included in an urban homestead and that certain property of an unmarried adult might be exempt as a homestead.

At the convention of 1875 opposition again arose to the provision preventing the husband from alienating the homestead without the wife's consent. But eloquent pleas were made picturing the sad effect of drunken and worthless husbands bringing their wives to want and poverty, and the provision was retained.

Notes of Decisions (1665)

Vernon's Ann. Texas Const. Art. 16, § 50, TX CONST Art. 16, § 50
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**Tab  D**

**End of Document**                                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab  D**

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 5. Exempt Property and Liens
      Subtitle A. Property Exempt from Creditors' Claims
        Chapter 41. Interests in Land (Refs & Annos)
          Subchapter A. Exemptions in Land Defined (Refs & Annos)

V.T.C.A., Property Code § 41.001

§ 41.001. Interests in Land Exempt from Seizure

Effective: September 1, 2001
Currentness

(a) A homestead and one or more lots used for a place of burial of the dead are exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.

(b) Encumbrances may be properly fixed on homestead property for:

(1) purchase money;

(2) taxes on the property;

(3) work and material used in constructing improvements on the property if contracted for in writing as provided by Sections 53.254(a), (b), and (c);

(4) an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding;

(5) the refinance of a lien against a homestead, including a federal tax lien resulting from the tax debt of both spouses, if the homestead is a family homestead, or from the tax debt of the owner;

(6) an extension of credit that meets the requirements of Section 50(a)(6), Article XVI, Texas Constitution; or

(7) a reverse mortgage that meets the requirements of Sections 50(k)-(p), Article XVI, Texas Constitution.

(c) The homestead claimant's proceeds of a sale of a homestead are not subject to seizure for a creditor's claim for six months after the date of sale.

**Tab E**

**Credits**

Added by Acts 1985, 69th Leg., ch. 840, § 1, eff. June 15, 1985. Amended by Acts 1993, 73rd Leg., ch. 48, § 2, eff. Sept. 1, 1993; Acts 1995, 74th Leg., ch. 121, § 1.01, eff. May 17, 1995; Acts 1995, 74th Leg., ch. 121, § 2.01, eff. Nov. 7, 1995; Acts 1997, 75th Leg., ch. 526, § 1, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 516, § 1, eff. Sept. 1, 2001.

Notes of Decisions (352)

V. T. C. A., Property Code § 41.001, TX PROPERTY § 41.001

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab E**

> Vernon's Texas Statutes and Codes Annotated
>    Property Code (Refs & Annos)
>       Title 5. Exempt Property and Liens
>          Subtitle B. Liens
>             Chapter 53. Mechanic's, Contractor's, or Materialman's Lien (Refs & Annos)
>                Subchapter K. Residential Construction Projects

V.T.C.A., Property Code § 53.254

§ 53.254. Homestead

Currentness

(a) To fix a lien on a homestead, the person who is to furnish material or perform labor and the owner must execute a written contract setting forth the terms of the agreement.

(b) The contract must be executed before the material is furnished or the labor is performed.

(c) If the owner is married, the contract must be signed by both spouses.

(d) If the contract is made by an original contractor, the contract inures to the benefit of all persons who labor or furnish material for the original contractor.

(e) The contract must be filed with the county clerk of the county in which the homestead is located. The county clerk shall record the contract in records kept for that purpose.

(f) An affidavit for lien filed under this subchapter that relates to a homestead must contain the following notice conspicuously printed, stamped, or typed in a size equal to at least 10-point boldface or the computer equivalent, at the top of the page:

"NOTICE: THIS IS NOT A LIEN. THIS IS ONLY AN AFFIDAVIT CLAIMING A LIEN."

(g) For the lien on a homestead to be valid, the notice required to be given to the owner under Section 53.252 must include or have attached the following statement:

"If a subcontractor or supplier who furnishes materials or performs labor for construction of improvements on your property is not paid, your property may be subject to a lien for the unpaid amount if:

(1) after receiving notice of the unpaid claim from the claimant, you fail to withhold payment to your contractor that is sufficient to cover the unpaid claim until the dispute is resolved; or

(2) during construction and for 30 days after completion of construction, you fail to retain 10 percent of the contract price or 10 percent of the value of the work performed by your contractor.

**Tab F**

"If you have complied with the law regarding the 10 percent retainage and you have withheld payment to the contractor sufficient to cover any written notice of claim and have paid that amount, if any, to the claimant, any lien claim filed on your property by a subcontractor or supplier, other than a person who contracted directly with you, will not be a valid lien on your property. In addition, except for the required 10 percent retainage, you are not liable to a subcontractor or supplier for any amount paid to your contractor before you received written notice of the claim."

**Credits**

Added by Acts 1997, 75th Leg., ch. 526, § 23, eff. Sept. 1, 1997.

Notes of Decisions (16)

V. T. C. A., Property Code § 53.254, TX PROPERTY § 53.254

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab F2**

**Tab F**

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection;
      Apportionment of Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV-Full Text

AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE
PROCESS; EQUAL PROTECTION; APPOINTMENT OF REPRESENTATION;
DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

<Section 1 of this amendment is further displayed in separate documents according to subject matter,>

<see USCA Const Amend. XIV, § 1-Citizens>

<see USCA Const Amend. XIV, § 1-Privileges>

**Tab G**

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV-Full Text, USCA CONST Amend. XIV-Full Text
Current through P.L. 114-49 approved 8-7-2015

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab G**

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article I. Bill of Rights (Refs & Annos)

Vernon's Ann.Texas Const. Art. 1, § 15

§ 15. Right of trial by jury

Currentness

Sec. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. Provided, that the Legislature may provide for the temporary commitment, for observation and/or treatment, of mentally ill persons not charged with a criminal offense, for a period of time not to exceed ninety (90) days, by order of the County Court without the necessity of a trial by jury.

**Credits**
Amended Aug. 24, 1935.

**Editors' Notes**

**INTERPRETIVE COMMENTARY**

**2007 Main Volume**

One of the most characteristic elements of the American constitutional inheritance from England is that of trial by jury. In origin it grew from a practice in Norman times known as an inquest which was composed of a selected group from the community to tell the facts about certain situations, *e. g.,* to tell who was guilty of a crime, or who had title to land. From this institution the jury developed, changing through time from a body of people chosen because they knew the facts to a body whose function is to determine the facts on the basis of evidence given at the trial.

Trial by jury has been considered as a fundamental safeguard of constitutional liberty. The Declaration of Independence complains of the British Government for denying the colonists in many cases a trial by jury. The Texas Declaration of Independence makes the same indictment against Mexico, declaring that Mexico "has failed and refused to secure, on a firm basis, the right of trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen." As a result the right was placed in the Bills of Rights of both the United States Constitution and that of Texas.

The words of Section 15 declare that trial by jury shall remain inviolate. This has been interpreted to mean that in each case where the issue is raised, an inquiry should be made into the practice before the constitution was adopted to determine whether such issues were tried by a jury; hence, any right to a jury trial that existed at the time of the adoption of the constitution is confirmed. *White v. White,* 108 T. 570, 196 S.W. 508, L.R.A.1918A, 339 (1917).

Section 15 further grants to the legislature the power to regulate the right of trial by jury, and to maintain its purity and efficiency. This clause does not permit reduction of the right. It does permit the legislature to deny the right in cases where no right to jury trial existed at common law, the section merely protecting the right as it existed at the time the constitution went into effect. *Johnson v. State,* Civ.App., 267 S.W. 1057 (1925).

**Tab H**

Historically in equity proceedings, the chancellor was judge of fact as well as of law, there being no right of trial by jury. In Texas, however, ever since the first state constitution of 1845, a party is not deprived of a jury trial in a suit of an equitable nature. *San Jacinto Oil Co. v. Culbertson,* 100 T. 462, 101 S.W. 197 (1907).

In civil cases for the trial of a cause, wherein a fact situation is raised by the pleadings, either party is entitled to a jury upon a demand made to the court and the payment of the jury fee. See *Hammond v. Ashe,* 103 T. 503, 131 S.W. 539 (1910); *Thorne v. Moore,* 101 T. 205, 105 S.W. 985 (1907); *Blair v. Paggi,* Com.App., 238 S.W. 639 (1922). If these conditions are met, the right is inviolate.

In civil cases and misdemeanor cases a jury may be waived. *Neill v. Tarin,* 9 T. 256 (1852); *Wagner v. State,* 87 Cr.R. 47, 219 S.W. 471 (1920); *Armstrong v. State,* 98 Cr.R. 335, 265 S.W. 701 (1924). However, in a capital case the defendant may not waive the right, but in felony cases less than capital he may, upon entering a plea of guilty, waive a jury trial in open court in person with the approval and consent of the court and of the state's attorney. See Vernon's Ann.C.C.P. [1925] art. 518 [see, now, Vernon's Ann.C.C.P. art. 27.14].

The right to trial by jury means, of course, the right to a trial by an impartial jury. See *Pierson v. State,* 18 Tex.App. 524 (1885). Within the limits of denying the parties an impartial jury, the legislature may prescribe the procedure for impanelling the jury and the qualifications of jurors. However, it is violative of the due process clause of the fourteenth amendment of the Federal Constitution, as well as of the state constitution, to exclude any citizen because of race or color. *Jackson v. State,* 63 Cr.R. 351, 139 S.W. 1156 (1911); or to discriminate on other grounds where such discrimination would tend to prejudice or favor an accused person. See *Lively v. State,* Crim.App., 73 S.W. 1048 (1903).

Notes of Decisions (602)

Vernon's Ann. Texas Const. Art. 1, § 15, TX CONST Art. 1, § 15
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab H**

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article I. Bill of Rights (Refs & Annos)

Vernon's Ann.Texas Const. Art. 1, § 19

§ 19. Deprivation of life, liberty, etc.; due course of law

Currentness

Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

**Editors' Notes**

**INTERPRETIVE COMMENTARY**

**2007 Main Volume**

Section 19 of the Texas Bill of Rights is a due process of law provision and has been included in all of the Texas Constitutions. The words "due process of law" or "due course of the law of the land" are the equivalent of the phrase "law of the land" in Magna Carta.

This provision has been construed by the courts as affording several types of protection. It has been said that "when the great barons of England wrung from King John, at the point of the sword, the concession that neither their lives nor their property should be disposed of by the crown, except as provided by the law of the land, they meant by 'law of the land' the ancient and customary laws of the English people, or laws enacted by the Parliament. . . .. It was not in their minds, therefore, to protect themselves against enactment of laws by the Parliament of England." Davidson v. New Orleans, 96 U.S. 97, 24 L.Ed. 616 (1878).

Therefore, originally the due process clause was construed as applying to the method of making a judicial or administrative decision. It applied directly to the machinery or procedure by which people were tried for crime, by which property rights were adjudicated, by which the powers of eminent domain and taxation were exercised. In short, legal proceedings were and are required to be conducted by the rules and forms established for the protection of private rights. Otherwise, life, liberty or property would be taken without due process of law so as to be violative of the fundamental principles. See Steddum v. Kirby Lumber Co., 110 T. 513, 221 S.W. 920 (1920).

As applied to procedure, due process requires a fair and impartial trial before a competent tribunal. Vogt v. Bexar County, 5 Tex.App. 272, 23 S.W. 1044 (1893). Included within this requisite is an opportunity to be heard, and reasonable opportunity to prepare for the hearing, which, of course, encompasses reasonable notice of the claim or charge against an individual so as to advise him of the nature thereof, and of the relief sought. State ex rel. Merriman v. Ball, 116 T. 527, 296 S.W. 1085 (1927), Steddum v. Kirby Lumber Co. *supra*.

The right to a hearing requires a judicial examination of every issue that, according to established procedure, may affect the attainment of a legal trial, and in such a trial determine the cause according to law. Freeman v. Ortiz, 106 T. 1, 153 S.W. 304 (1913). There should be opportunity given to cross examine witnesses and to produce witnesses and to be heard on questions of law. Steddum v. Kirby Lumber Co., *supra*.

**Tab I**

Due process of law not only includes procedural protection, but also substantive protection. It is a direct constitutional restraint upon the substance of legislation and means that a legislative curtailment of personal or property rights must be justified by a resultant benefit to the public welfare. Thus the due process guaranty does not restrain the state in the exercise of its legitimate police powers. See City of New Braunfels v. Waldschmit, 109 T. 302, 207 S.W. 303 (1918). Houston & Tex. Cent. Ry. Co. v. Dallas, 98 T. 396, 84 S.W. 648 (1905). Both liberty and property are subject to the exercise of these powers.

Nevertheless, the exercise of the police powers is not unrestricted, but is limited to enactments having reference to the public health, comfort, safety and welfare. It must not be arbitrary, unreasonable, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained. See Spann v. City of Dallas, 111 T. 350, 235 S.W. 513 (1921), Houston & T.C. Ry. Co. v. City of Dallas, *supra*; American Federation of Labor v. Mann, Civ.App., 188 S.W.2d 276 (1945).

In substantive due process cases, the courts balance the gain to the public welfare resulting from the legislation against the severity of its effect on personal and property rights. Every exercise of the police power involves a restraint upon individual freedom of action or the free use of property based upon some social need which presumably justifies the restraint. Hence, a law is unconstitutional as violating due process when it is arbitrary or unreasonable, and the later occurs when the social necessity the law is to serve is not a sufficient justification of the restriction of liberty involved.

For example, the police power may be constitutionally exercised to destroy property where the social necessity or interest involved is the prevention of the spread of disease or conflagration. Chambers v. Gilbert, 17 Tex.App. 106, 42 S.W. 630, error refused (1897); Keller v. City of Corpus Christi, 50 T. 614 (1879). Again the liberty of contract between employers and employees may be regulated under the police power by limiting the hours of labor in order to promote the public health. See Bunting v. State of Oregon, 37 S.Ct. 435, 243 U.S. 426, 61 L.Ed. 830 (1916).

The Federal Constitution, in the fifth and fourteenth amendments, also provides against deprivation of life, liberty or property without due process of law, the fourteenth amendment by its language being applicable to prevent the states from carrying out such a deprivation. It has been held by Texas courts that the clause of the Texas Constitution, to the extent that it is identical with the fourteenth amendment, has placed upon the powers of the state legislature the same restrictions as those which have been held to be imposed by the language of that amendment of the Federal Constitution. Mellinger v. City of Houston, 68 T. 37, 3 S.W. 249 (1887).

Notes of Decisions (2844)

Vernon's Ann. Texas Const. Art. 1, § 19, TX CONST Art. 1, § 19
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab I**